Merrimack, ⎰
May 7, 1912. ⎱

## GLOVER v. BAKER, Ex'r, & a.

Whether all or a part of the issues in an action shall be tried at one time, and the order in which they shall be tried if determined separately, are questions which are ordinarily settled in the superior court.

An heir-at-law who claims adversely to a will cannot maintain a bill in equity praying for the advice of the court as to his right in the estate; but where a defendant executor has interposed no objection to the maintenance of such a bill, and the opposing views have been fully presented, the proceeding may be treated as a request for advice by the executor, and the opinion of the court be expressed upon the questions involved for his protection and for the purpose of disposing of the controversy.

Upon a demurrer to a bill in equity, the facts must be taken as stated by the adverse party and cannot be varied or answered by allegations of fact.

The allowance of a will by the probate court is a judgment which conclusively establishes its genuineness and validity until the decree is set aside in a direct proceeding for that purpose; and the issues of fraud and undue influence in procuring the execution of the instrument are not triable upon a bill in equity for its construction.

A devise to an unincorporated religious society, in trust for the repair of church buildings and for the extension and promotion of a certain faith, is a donation for religious purposes and not a gift to or for the use of the particular church which is designated as trustee.

The statute which limits the income of any grant or donation made to or for the use of a church (P. S., c. 152, s. 10) is a regulation of the property-holding capacity of religious societies, and not a restriction upon testamentary disposition to pious uses.

The indirect restraint upon testamentary gifts to religious societies which is imposed by section 10, chapter 152, Public Statutes, relates solely to donations to New Hampshire churches and does not limit the capacity of a citizen of this state to dispose of property by will for the benefit of churches located elsewhere.

A devise of the residuum of an estate to a religious society, in trust for the purpose of keeping certain church buildings in repair and promoting and extending the religion of Christian Science as taught by the testatrix, constitutes a charitable trust which is not invalid for indefiniteness or ambiguity.

A devise for the promotion and extension of Christian Science is not invalid as a charitable trust merely because that religion includes a system of faith-cure for disease and is in some sense a business which is carried on for pecuniary profit.

The practice of Christian Science healing is not forbidden by express enactment
   or by the general course of legislation of the state; and a devise in trust for the
   promotion and extension of a religion which inculcates a belief in the efficacy of
   that system of treating disease is not void as contrary to public policy.

BILL IN EQUITY, brought by George W. Glover, for the construc-
tion of the will of his mother, Mary B. G. Eddy, and for advice as
to the validity of certain provisions thereof.   The defendants are
the executor and five residents of Massachusetts who constitute
the board of directors of the First Church of Christ, Scientist, in
Boston.   The attorney-general, George W. Baker, a nephew of
the testatrix, John B. Baker, her grand-nephew, and George W.
Glover, Jr., a son of the plaintiff, were given leave to intervene.
Transferred from the April term, 1911, of the superior court upon
demurrer, without a ruling, by *Wallace*, C. J., who also of his own
motion transferred the question whether the bill can be maintained,
and if so, upon what grounds, in case such question is not properly
presented by the demurrer.   The plaintiff's motion to remand is
reported *ante*, 261.

*Hannis Taylor* and *William L. Chambers* (both of the District of
Columbia), *Herbert Parker* and *John D. Long* (both of Massachusetts),
and *William E. Chandler*, *John W. Kelley*, and *Dewitt C. Howe*
(*Messrs. Taylor, Parker, Long*, and *Howe* orally), for the plaintiff.

*Taggart, Tuttle, Burroughs & Wyman*, for George W. Baker.

*William A. J. Giles*, for John B. Baker.

*Remick & Jackson*, for George W. Glover, Jr.

*Edwin G. Eastman*, attorney-general, *Robert L. Manning*, special
counsel, and *Joseph S. Matthews*, for the state.

*Elder, Whitman & Barnum*, *William A. Morse*, and *Leon M.
Abbott* (all of Massachusetts), and *Streeter, Demond & Woodworth*
(*Messrs. Elder* and *Streeter* orally), for the defendants.

PARSONS, C. J.   Mary Baker Eddy died December 3, 1910.
On the 14th of that month her will was duly probated in this county.
The defendant Baker has been appointed executor and has qualified
by giving bond.   January 12, 1911, the plaintiff, a son of the de-

ceased, commenced this proceeding against the executor and five persons alleged to be the directors of the First Church of Christ, Scientist, in Boston, Massachusetts. The plaintiff in his bill (or petition, as he names it) alleged the above facts, argumentatively stated that the property of the deceased exceeds two million dollars in value, alleged that the will attempts to dispose of the great bulk of the estate by gifts to said church or its directors directly and in trust, and attacked the validity of the clauses of the will making such gifts. The prayer of the bill is for the advice of the court as to the true construction, meaning, and effect of the will and the right of the plaintiff to receive any of the property which the will attempts to dispose of by the clauses attacked. The defendants demurred, pleaded in bar, and answered. It does not appear from the record which has been sent to this court that there has been any joinder on, or answer to, the various pleadings. There is no replication to the answer; the case has not been set for hearing upon the bill and answer, or for argument upon the plea. The only progress in the superior court appears to have been a motion by the plaintiff for hearing upon the demurrer.

Whether all or a part of the issues in an action shall be tried at one time, and the order in which they shall be tried if determined separately, is a question of justice and convenience usually settled by the superior court. Owen v. Weston, 63 N. H. 599; Glover v. Baker, ante, 261. Although the defendants' plea presented matter claimed to bar the plaintiff from making any claim to his mother's estate, in the situation of the case the superior court was of the opinion that the progress of the cause would be advanced by first securing a final determination of the questions of law raised by the demurrer, and transferred those questions to this court, with the suggestion that if the defendants' demurrer does not raise the question whether the bill can be maintained and, if maintainable at all, upon what grounds it may be maintained, those questions were specially reserved by the presiding justice of his own motion. The power of the court to make such a transfer has already been determined. Glover v. Baker, ante, 261.

No ground appears upon which to question the ruling as a finding of fact of proper procedure, even if upon portions of the pleadings other questions were presented to the trial court for decision. The defendants' plea went merely to the maintenance of this action by the plaintiff. It did not support the validity of the bequests. The plaintiff concedes that if the bequests are lawful

he has barred himself from questioning the will. If the bequests are unlawful, such as the law will not permit to be carried into effect, whether in that case the plaintiff is or is not entitled to share in the estate thereby left undisposed of by the will is a question between him and the other parties who have been permitted to join in the litigation—the more remote heirs of Mrs. Eddy and the state. Especially in view of the claim of escheat now made by the state, is it clear that the validity of the bequests must at some time be determined. If they are valid, the litigation is ended. If they are invalid, the legatees have no further interest in the cause.

The question transferred is the right of the plaintiff to maintain the bill. The prayer of the bill is for advice as to the plaintiff's rights. The defendants demur for the reason that it appears on the face of the bill that the plaintiff does not occupy a position entitling him to the advice and direction of a court of equity. The only parties who can call on the court for advice are those in a fiduciary position. Questions are prospectively determined by a court of equity only in behalf of trustees who in the execution of a trust are entitled to its protection. *Greeley* v. *Nashua,* 62 N. H. 166, 167; *Ellis* v. *Aldrich,* 70 N. H. 219, 222; *Bailey* v. *McIntire,* 71 N. H. 329; *Drake* v. *True,* 72 N. H. 322; *Harvey* v. *Harvey,* 73 N. H. 106.

The plaintiff is not a trustee, nor is he a beneficiary of the trusts attempted to be created by the will, nor does he ask in terms that a trust be declared for his benefit in the property in question. He is not entitled to the advice of the court. The defendants did not insist upon this objection in argument, but appear to concede in the brief, and in fact did concede in oral argument, that if the plaintiff might have an interest in the estate he could require a construction of the will. The plaintiff claims in his brief that "there can be no possible question either as to the jurisdiction of the superior court or as to the form of the bill in the present case." But while, in view of the attitude of the parties to the cause, the court may perhaps properly proceed to the consideration of the validity of the questioned clauses of this will, an examination of the cases cited by the plaintiff does not so clearly sustain the proposition above quoted that the question can properly be passed without some consideration. The procedure in this case ought not to be permitted to stand as authority for the proposition, that immediately upon his appointment an executor can be dragged into court and compelled to litigate against his will questions which certainly

cannot arise until the estate is ready for distribution, unless it is clear such is the law. When questions as to the meaning or validity of the clauses of a will come before a court in the exercise of its ordinary jurisdiction, such an instrument is construed as part of the determination of the cause. But this does not require the court to advise every one who may think he has an interest under or adverse to a will or other instrument. The only case of similar procedure found in this state is *Haynes* v. *Carr*, 70 N. H. 463. In that case the executors filed an answer, which they asked to have considered as a cross-bill, asking the advice of the court, and the case was disposed of by ordering the dismissal of the plaintiff's bill with a decree advising the executors. *Ib.* 484.

In *Bowers* v. *Smith*, 10 Paige 193, it is said, in substance as quoted in the plaintiff's brief: "An executor takes the legal estate in the personal property of the testator as trustee for the legatees or next of kin; and the court of chancery having general jurisdiction in cases of trusts, any person having an interest in such property, either as a legatee or distributee of the decedent, may file a bill in that court against the executor, to have the construction of the will settled, or to have the question as to the validity of any of its provisions determined, so far as concerns the interest of the complainant in the property, and to have a decree against such executor for such parts or portions of the property as he is legally and equitably entitled to receive." This statement was not involved in the decision of the case, but was merely "asserted by the chancellor." *Read* v. *Williams*, 125 N. Y. 560, 566. The New York cases are in conflict, and the jurisdiction appears finally to be rested upon the provisions of the code. *Read* v. *Williams, supra,* 566. See *Wager* v. *Wager,* 89 N. Y. 161; *Horton* v. *Cantwell,* 108 N. Y. 255, 267.

The correct rule in the absence of statute, which is followed here, is set forth in *Chipman* v. *Montgomery,* 63 N. Y. 221, 230: "The plaintiffs, as heirs-at-law and next of kin claiming in hostility to the will, have no interest in the interpretation of that instrument and have no standing in court in an action for that purpose, but must assert their rights directly by proper action at their peril, taking the chances of being subjected to costs in case of failure, as in other controversies. . . . A court of equity has an incidental jurisdiction in respect to wills and does not take jurisdiction of an action brought merely for the construction of a will or other instrument at the instance of every person who claims to be directly

or indirectly interested in the subject-matter of the instrument. The rule is, that to put a court of equity in motion there must be an actual litigation in respect to matters which are proper subjects of the jurisdiction of that court, as distinguished from a court of law. . . . Hence one who claims real property must bring his action of ejectment or other proper action for its recovery, and he who has a right to personalty, or to any debt or duty which is the subject of an action at common law, must resort to the appropriate remedy by action for the specific property, debt, or duty, or damages for the infringement of his right. It is by reason of the jurisdiction of the court of chancery over trusts that courts having equity powers, as an incident of that jurisdiction, take cognizance of and pass upon the interpretation of wills. They do not take jurisdiction of actions brought solely for the construction of instruments of that character, or when only legal rights are in controversy."

"It is when the court is moved in behalf of an executor, trustee, or *cestui que trust*, and to insure a correct administration of the power conferred by a will, that jurisdiction is had to give a construction to a doubtful or disputed clause in a will. The jurisdiction is incidental to that over trusts." *Folger*, J., in *Bailey* v. *Briggs*, 56 N. Y. 407, 413.

In no case that has been cited is it held that an heir claiming in hostility to a will can require the advice of the court as to his right in the estate. The only principle that has been laid down is that he may under some circumstances bring a bill to declare his beneficial interest, under his claim as heir to a distributive share in funds in the executor's hands. In *Parsons* v. *Parsons*, 9 N. H. 309, it is held: "An administrator is a trustee for heirs and creditors; and this court, sitting as a court of chancery, has power over trusts of that description, upon a proper case for enforcing the rights of those interested in the trusts." But a bill in equity cannot be maintained against an executor merely upon the ground of the trust implied by law; a special case must be shown calling for equitable relief. *Walker* v. *Cheever*, 35 N. H. 339; *Joslin* v. *Wheeler*, 62 N. H. 169. By the constitution and the statute, the probate court has exclusive, original jurisdiction of the probate of wills and the settlement and distribution of the estates of deceased persons. *Knight* v. *Hollings*, 73 N. H. 495, 497; Const., *art.* 79 [80]; P. S., c. 182, s. 2. Until the settlement of the executor's account, the probate court has entire jurisdiction of the necessary prodecure.

*Hayes* v. *Hayes*, 48 N. H. 219, 224, 225.  The superior court has no power to require the executor to account for his administration upon a bill in equity, or to revise proceedings in the probate court except upon appeal.  *Reed* v. *Prescott*, 70 N. H. 88; *Ayer* v. *Messer*, 59 N. H. 279.  If upon settlement of the executor's account the executor refuses to pay the plaintiff any sums to which he may be legally entitled, the plaintiff has a complete remedy upon the administration bond.  If in such case the executor withholds from an heir property to which the heir lays claim, it may not be very material under New Hampshire practice whether the heir at its inception denominates his proceeding a bill in equity or some action at common law; but an attempt to bring the executor to account in equity traverses jurisdictional provisions established by the constitution.

But the plaintiff does not ask for an accounting by the executor, or for a decree requiring payment to him.  His sole request is for advice as to his rights.  As the plaintiff is not entitled to such advice, the petition should be dismissed so far as any proceeding thereunder is based upon the plaintiff's right to maintain it.  But when the question of construction has been fully argued by all parties interested and both desire the opinion of the court, a court may express its opinion although dismissing the petition.  *Austin* v. *Bailey*, 163 Mass. 270.  And where the parties in conflict have brought in the administrator and fully tried their case, for the protection of the administrator the opinion of the court, as advice to him, has been given to dispose of the controversy.  *Day* v. *Washburn*, ante, 203.  Upon this ground alone, in the final argument for the plaintiff, is it claimed the proceeding is maintainable.  In this case the executor is a party represented by counsel.  The plaintiff and the claimants under the will have fully presented the opposing views in argument.  All persons understood to be interested are represented before the court or have had notice of the proceeding.  The executor has not insisted in argument upon the technical objection to the maintenance of the proceeding by the plaintiff.  The rights of the parties are not so clear that it would not be his duty to them, as well as to himself, to obtain at the proper time a judicial determination of their conflicting claims.  *Tilton* v. *Society*, 60 N. H. 377.  In this view, the concession in argument by counsel for the executor that the proceeding is maintainable in some form may be treated as a request for advice which

authorizes the court to express for his benefit the opinions formed upon the material points argued.

The plaintiff attacks the fourth, sixth, and eighth (or residuary) clauses of the will. It is conceded that the fourth and sixth clauses of the will are valid if the residuary clause can be sustained. It will be unnecessary, therefore, to discuss them until the residuary clause is found invalid. The residuary clause contained a provision as to Pleasant View, the testatrix's residence in Concord, which was revoked by the second codicil. Omitting this provision, the residuary clause reads: "I give, bequeath, and devise all the rest residue, and remainder of my estate, of every kind and description, to the Mother Church—the First Church of Christ, Scientist, in Boston, Massachusetts—in trust for the following general purposes: I desire that such portion of my residuary estate as may be necessary shall be used for the purpose of keeping in repair the church building and my former house at Number 385 Commonwealth avenue, in said Boston, which has been transferred to said Mother Church, and any building or buildings which may be, by necessity or convenience, substituted therefor; . . . and I desire that the balance of said income, and such portion of the principal as may be deemed wise, shall be devoted and used by said residuary legatee for the purpose of more effectually promoting and extending the religion of Christian Science as taught by me."

The legatees stand upon the will. The plaintiff in his bill has stated the facts upon which he claims that the bequests attempted to be made by the will are invalid. The demurrer admits all facts well pleaded, but does not admit the conclusions of law attempted to be drawn therefrom. Although the bill admits that in the lifetime of his mother, in consideration of payments made to him, the plaintiff agreed that she might, if she saw fit, dispose of her property in any lawful way, no agreement in writing is set forth in the bill, nor does the plaintiff admit any agreement, debarring him from prosecuting the claim he makes upon the ground upon which he seeks to place it. The validity and effect of the agreements set forth in the plea are questions not raised by the demurrer and not now before the court. It is elementary, that upon demurrer the facts must be taken as alleged by the opposing party and cannot be varied or answered by allegations of fact. *Tappan* v. *Evans*, 11 N. H. 311, 321, 322, 323; Sto. Eq. Pl., s. 448; 1 Dan. Ch. Pr. *598.

One ground upon which the plaintiff attacks the residuary be-

quest is that it was obtained by fraud, concealment of what are alleged to be material facts, and undue influence. These issues of fraud and undue influence in securing the execution of the will are not open in this proceeding. The decree of the probate court allowing the will is a judgment establishing the document to be the will of Mrs. Eddy. That judgment is not open to collateral attack. *Spofford* v. *Smith*, 59 N. H. 366; *Poplin* v. *Hawke*, 8 N. H. 124. As long as the decree stands, "it is conclusive of the genuineness and validity of the will." *Knight* v. *Hollings*, 73 N. H. 495, 500. Except in a direct proceeding to set the probate aside, evidence of facts inconsistent with the validity of the decree is incompetent. *Kent* v. *Hunt*, 74 N. H. 74; *Simmons* v. *Goodell*, 63 N. H. 458. Whether the paper presented for probate was Mrs. Eddy's will, or the product through fraud or undue influence of other minds operating upon hers, is a question which could have been raised in opposition to its probate as her will and which, whether raised or not, is conclusively determined by the judgment. If the objection went only to a portion of the will,—to the bequests to the legatees who are defendants,—it would have defeated the will only to the extent of the proof, and the probate of the will could have been limited to the portions, if any, found not to have been so induced. *Owen* v. *Weston*, 63 N. H. 599, 603; *Marston* v. *Marston*, 17 N. H. 503, 508; *Sumner* v. *Crane*, 155 Mass. 483, 484; *Post* v. *Mason*, 91 N. Y. 539, 550; *Allen* v. *McPherson*, 1 H. L. C. 191. The only matters open here are the construction of the disputed clause, ascertaining upon competent evidence what the testatrix meant by the words she used; and the inquiry when the testatrix's purpose is ascertained, if it can be, whether that purpose is one that can be carried into effect. If the donor's purpose can be ascertained and is legal, it is the duty of the court to give it effect. *Adams* v. *Page*, *ante*, 96.

The testatrix gave the bulk of her property in trust to be devoted and used for the purpose of promoting and extending the religion of Christian Science as taught by her. Her understanding that she was not making in the residuary clause a direct gift to the legatee is made certain, if anything beyond the language of the clause itself were needed, by the direct gift of fifty thousand dollars to the legatee in the sixth clause. It is argued that the object of the legatee, The First Church of Christ, is the extension and promotion of the religion of Christian Science, and that the subject of the gift to it in trust for the purpose named must be used for

the same purpose as if given to it directly. This may be so. A gift to a charitable or religious organization, without more, is in trust for the purposes of the organization. *Hale* v. *Everett*, 53 N. H: 9, 77; 2 Per. Tr. (2d ed.), s. 733. But for some reason the testatrix saw fit to make more certain the purpose of her residuary gift by declaring the trust upon which it was given. The language she used cannot be disregarded. Uncertainty as to the corporate capacity of the legatee to hold directly and administer for the purposes of its organization so large a fund may have inspired the express definition of the trust.

The allegations of fact of the bill and amendments are reduced by counsel for the plaintiff in argument to two fundamental propositions which, however, are in direct conflict with each other: (1) The legatee, The First Church of Christ, Scientist, is an unincorporated religious society for the promotion of Christian Science as taught by Mrs. Eddy. (2) The legatee is not a charitable organization, but a business organization for the purpose of practicing and vending a system of faith-cure invented by Mrs. Eddy, the religious feature of which is only for the commercial purpose of giving vogue and salability to the cure. The first proposition is that of the original bill; the second is deduced from the facts alleged in the numerous amendments. No objection has been made to this double aspect of the facts claimed to be presented by the bill.

Under the first view, that the legatee is a church, from which it follows that the scheme it is organized to promote is a religion, alleged to be that taught by Mrs. Eddy, the plaintiff claims the gifts are void because prohibited by statute law. The Massachusetts statute relied upon is: "The income of the gifts, grants, bequests, and devises made to or for the use of any one church shall not exceed two thousand dollars a year." R. L., c. 37, s. 9. The New Hampshire provision is: "The income of any grant or donation made to or for the use of a church shall not exceed five thousand dollars a year." P. S., c. 152, s. 10.

The facts alleged do not bring the case within the terms of the statutes. The residuary clause in its principal feature is not a gift to a church or for the use of a church. It is on its face a gift for religious purposes. Whether a church may or may not act as trustee of such a trust, or whether the language of the will creates a valid trust or not, neither question is expressly concluded by the words of the statutes. But "it is a very familiar rule in the interpretation of statutes, that all parts of the act must be con-

sidered together, and such construction given to it as will best answer the intention of the makers. To accomplish this object, in some cases the letter of the statute may be restrained by an equitable construction; in others enlarged; and sometimes the construction may be even contrary to the letter. . . . What is within the legally proved intention of the legislature is within the statute, though not within the letter; and what is within the letter, but not within the intention, is not within the statute." *State* v. *Banks*, 75 N. H. 27, 31.

The claim is that the sections cited are not merely regulations of or limitations upon the corporate holding power conferred upon the deacons and other similar officers of churches by the statutes of which they are a part, but, construed according to the purpose of the legislature as evidenced by their history and source, they also are intended to be and are limitations upon testamentary power. In this view the New Hampshire statute only is material, for Massachusetts cannot determine the extent to which New Hampshire permits or authorizes its citizens to dispose of property by will. Consequently the Massachusetts statute is material only as a limitation of the power of the testamentary trustee. The history of these sections, later more fully considered, shows them to be part of legislation enacted because of doubt of the validity of gifts in trust to unincorporated associations—a doubt no longer entertained, since grants or gifts to an unincorporated association are sustained in equity. *Bartlett* v. *Nye*, 4 Met. 378; 1 Per. Tr., *s.* 46.

In *Sohier* v. *St. Paul's Church*, 12 Met. 250, it is held that under the Massachusetts statute declaring that the deacons "be deemed bodies corporate," a church is authorized to execute a trust for a purpose not foreign to those of its organization. The same result appears to follow from the conclusion of the historical argument of the plaintiff's counsel, that the purpose and effect of the legislation upon the subject has been to transfer to these religious societies the parochial functions of towns—a conclusion which was pointedly enforced by the citation of the existing statute (P. S., *c.* 152, *s.* 2) authorizing such societies to raise money by taxation of their members. This means that such societies are towns so far as such powers existing in towns prior to the legislation may extend. From this it would seem to follow, as towns like other corporations may act as trustees for purposes not incompatible with the objects of their organization (*Sargent* v. *Cornish*, 54 N. H. 18; *Dublin Case,*

38 N. H. 459, 577; 1 Per. Tr., *ss.* 42, 43), that the religious societies having their parochial powers might so act.

In view of the suggestion that the precise question as to the competency of this church is now pending before the Massachusetts court between the same parties, this court would not attempt to pass upon it in advance of that court unless it were essential to the rights of the parties that it should do so without delay. *Moore* v. *Casualty Co.,* 74 N. H. 47. But it is unnecessary to decide at this time whether under Massachusetts law an unincorporated religious society may not act as trustee for a purpose not foreign to the objects of its association. The gift is not to the church but in trust, and unless it is sustainable as a charitable trust it is invalid, and whether the church could act as trustee if the trust were valid is immaterial; while if the will creates a valid trust, the refusal of the trustee named in the will to act because of incapacity under Massachusetts law, or otherwise, will not avoid the trust, which cannot fail merely because of disability of the trustee. "It is a rule without exception that equity never allows a legal and valid trust to fail for want of a trustee." *Campbell* v. *Clough,* 71 N. H. 181, 184; *Chapin* v. *School District,* 35 N. H. 445; *Hubbard* v. *Art Museum,* 194 Mass. 280, 290; *Vidal* v. *Girard,* 2 How. 127, 180. The only limitation of the rule is when it appears that the testator intended a personal trust in the trustee named in the will (*Fontain* v. *Ravenel,* 17 How. 369, 382), a conclusion which cannot be reached here because no person has been named as trustee. The trustee named is an association, and the testatrix must have intended the trust to be executed by the persons (whoever they might be) who from time to time might constitute the association or be its managers. The trust may be permanent, because the use may be restricted to the income; and the testatrix had in mind, consequently, succession in the individuals in control and did not intend to limit the discretion conferred to any particular person. *Lorings* v. *Marsh,* 6 Wall. 337, 354; 2 Per. Tr., *ss.* 721, 722. The testatrix intended the trust to be administered by persons professing the belief she desired to promote. Such persons it would be the duty of the court to appoint should occasion arise, or at least none in hostility thereto should be permitted to undertake the execution of the trust. *Smith* v. *Nelson,* 18 Vt. 511, 569. As the case stands, the incapacity of the church to act as trustee may be taken as sufficiently alleged as a fact by the bill and admitted by the demurrer. If a valid trust is created, the plaintiff is not concerned as to the manner in which or the persons by whom

the trust is carried into effect. *Burnham's Petition*, 74 N. H. 492, 494. The question of trustee will be settled at the proper time, upon the facts as they may then appear. As the gift is not to the church for its own use, it is unnecessary to consider the question argued at length, whether the state alone may take advantage of a limitation upon the corporate holding power of a corporation.

Does the law of this state limit the amounts that may be given to pious uses? "Every person of the age of twenty-one years, of sane mind, may devise and dispose of his property, real and personal, and of any right or interest he may have in any property, by his last will in writing." P. S., *c.* 186, *s.* 1. This chapter, under the title "Wills," does not restrict this general disposing power by limitations of the amount that may be given to educational, charitable, pious, or superstitious uses, or to any one corporation or individual. There is no such statutory limitation, unless contained in the section above quoted from chapter 152, Public Statutes, entitled "Religious Societies," whose purpose is, it has been said, to make provision "whereby defects in a church organization are supplied, so that property donated for pious purposes may not fail of reaching the objects intended by the donors." *Hennessey* v. *Walsh*, 55 N. H. 515, 531. In other words, the purpose of the chapter is not to limit or destroy gifts to pious uses, but to promote and effectuate them.

The section upon which the plaintiff relies was enacted here in 1842 and was doubtless taken from the Revised Statutes of Massachusetts of 1836. The argument that the income-limiting provision of the section is intended to make void gifts to any church which might produce an income in excess of the limit is based upon the claim that its provisions originated in section 1 of the English statute (9 Geo. 2, *c.* 36) commonly called the Georgian mortmain act. The evil at which this act was aimed, as set forth in the preamble, was the alleged fact that many large and improvident dispositions of their property were made by languishing and dying persons to uses called charitable uses, to the disherison of their lawful heirs; and the remedy enacted was to declare void all conveyances of land, or of money to be laid out in land, to any person or persons, corporate or otherwise, in trust for the benefit of any charitable use whatever, unless made by deed executed and delivered twelve months before the death of each donor or grantee and enrolled within six months after its execution. This section of the English statute does not treat in any form of the income corporations may hold; the New Hampshire statute does not declare

any gifts in trust void. The only possible connection between them comes through the Massachusetts provincial statute of 1754–5. Ancient Charters and Laws Mass. Bay 605; 2 Mass. Laws, *ed.* 1807, *p.* 1037. This act is defined in the title as "An act for the better securing and rendering more effectual grants and donations to pious and charitable uses." Section 1 declares that the deacons of Protestant churches shall be deemed so far bodies corporate as to take in succession all grants and donations "made either to their several churches, the poor of their churches, or to them and their successors," thereby resolving the doubt expressed in the preamble of the act whether such gifts would go in succession although so intended. Section 2 provides that the annual income of the grants made or to be made to any one such body politic for pious and charitable uses shall not exceed the sum of three hundred pounds; and also "that all such donations hereafter made by deed, which shall not be recorded in the register's office, in the county where the lands lie, three calendary months before the death of the donor, and all such bequests or devises which shall not be made . . . at least three months before the death of the testator, shall be utterly void and of no effect; anything in this act contained to the contrary notwithstanding." It seems very probable that this latter clause was inspired by the section of the English act before quoted; and if this clause had remained in the Massachusetts law or had ever been enacted in New Hampshire, the English decisions interpreting the English statute would be of value. But in 1786, the Massachusetts statute was revised and re-enacted in a new statute which omitted the clause which declared deeds and wills void unless made three months before the death of the donor or testator. 1 Mass. Laws, *ed.* 1807, *p.* 282. This provision was never adopted here, and there is no foundation for the claim that the New Hampshire "church statute" is derived from the Georgian mortmain act.

It was said in *Bartlet* v. *King*, 12 Mass. 536 (1815), that the provisions and restrictions of the act of 1754–5 (28 Geo. 2) related only to gifts and devises to the bodies politic created by that act; that donations or bequests to others could not reasonably be brought within the act; from which it would follow that gifts to charitable uses generally were not understood to be within the act. The point was not decided, because it was held that the act of 1786 repealed the provisions of the act of 1754–5 contended to render void a bequest to the American Board of Commissioners, "to

promote the pious objects thereof." In *Going* v. *Emery*, 16 Pick. 107 (1834), the purpose of the statute was said to be to remove doubts concerning the legal estate and to declare and confirm the same to these *quasi*-corporations created out of the church officers; that the statute "implies that such gifts were good in principle and in substance, but might be defeated by the ignorance or unskillfulness of the grantors, in not creating proper trustees, in whom the legal estate might vest, in order to support and carry out the charitable intent." The careful student of the Massachusetts law was therefore informed, at the time the Massachusetts provisions were adopted here in 1842, that their purpose was to promote and preserve certain gifts to pious uses, and that the provisions restricting generally the power of testators to bequeath or devise to charitable uses, if any had such effect, had been stricken from the act. This is the conclusion of the Massachusetts court. *Hubbard* v. *Art Museum*, 194 Mass. 280, 284. The plaintiff's answer is that the Massachusetts court made a plain mistake. If so, they have been consistent therein since 1815. If the legislation is approached from the view-point of its declared purpose—the promotion and preservation of gifts to or for churches—the income limitation is easily understood as a limitation upon the corporate power created by the act. If the act is viewed as the plaintiff attempts to consider it, as an intended restraint upon such gifts, an intent to defeat absolutely gifts in excess might be extracted from the act, even after the express removal of the words declaring the gifts void, which cannot be found in the act since 1786. But as the purpose is plainly declared in the preamble, the plaintiff's construction cannot be read into it.

But the question for this court is not what the language meant in Massachusetts in 1754-5, 1786, 1836, or now means, but what did it mean to the legislature which made it New Hampshire law in 1842. Upon this question the history of legislation upon the subject, the circumstances under which the act was adopted, and the other provisions accompanying it are competent evidence. *Stanyan* v. *Peterborough*, 69 N. H. 372, 373; *Weed* v. *Woods*, 71 N. H. 581, 583.

"The public worship of God and public instruction in morality and religion were recognized in the bill of rights in the constitution as 'giving the best and greatest security to government'; and to promote these, the legislature is empowered 'to authorize, from time to time, the several towns, parishes, bodies cor-

porate, or religious societies within this state to make adequate provision, at their own expense, for the support of public Protestant teachers of piety, religion, and morality.' Bill of Rights, *art.* 6. Prior to and at the time of the adoption of the constitution of 1784 and 1792, public religious worship was very generally supported by a tax laid by the several towns. The town was the parish or religious society, which, by authority of legislative acts, furnished the meeting-house and contracted with and paid the minister. The provincial statute of 1714 empowered towns to choose ministers and raise money by tax for their support, subject to the right and liberty of conscience. The same power, of enabling towns to support public worship by means of a tax, was fully set forth in section 10 of the act of February 8, 1791, entitled 'An act for regulating towns and the choice of town officers,' and which provided that the legal voters, at any regular meeting of the town, might, agreeably to the constitution, 'grant and vote such sum or sums of money as they should judge necessary for the settlement, maintenance, and support of the ministry, schools, meeting-houses, the maintenance of the poor, for laying out and repairing highways, for building and repairing bridges, and for all the necessary charges arising within the said town, to be assessed on the polls and estates in the same town as the law directs.' The support of the ministry and of houses of public worship was then on the same footing as that of schools, highways, and the support of the poor. With a gradual change arising from the multiplying of religious sects and the larger exercise of freedom of opinion, the system of supporting religious worship through the parochial functions of towns was by degrees abandoned, though authorized by law, until the act of 1819 repealed section 10 of the act of 1791, and empowered religious societies of every Christian sect 'to raise money by taxes upon the polls and ratable estate of the members' for maintaining houses of public worship and supporting the ministry." *Franklin-Street Society* v. *Manchester*, 60 N. H. 342, 347, 348; *Holt* v. *Downs*, 58 N. H. 170, 175; *Hale* v. *Everett*, 53 N. H. 9, 64–68; *Dublin Case*, 38 N. H. 459, 475.

The exemption from taxation for the support of teachers of another sect, persuasion, or denomination, guaranteed to the individual of any one particular sect or denomination by article 6 of the constitution and recognized in the early statute (Prov. Laws, *ed.* 1771, *pp.* 55, 138; Act of 1770, supp. same, *p.* 49), was not always

in practice effected under the act of 1791, authorizing taxation by towns for the support of the ministry. The question of fact remained for the decision of a jury, whether the objecting individual was of a different persuasion from the minister of the town. Sanborn Hist. N. H. 287, 289; Barstow Hist. N. H. 422–427. The first attempt at relief was a legislative declaration recognizing persons of particular religious belief as distinct religious sects or denominations entitled to the protection of the constitution and the laws; Freewill Antipedo Baptists, December 7, 1804; Universalists, June 13, 1805; Methodists, June 15, 1807. Laws, *ed.* 1815, *p.* 46. Another remedy was the incorporation of various religious societies, with authority to tax their members for the support of religious instruction of the particular kind favored by them. These incorporations at first gave little beyond the power to assess and collect taxes for the purpose named; but in time the powers conferred were enumerated with greater detail, and in nearly every instance the charters conferred in various terms authority upon the incorporations to receive and hold for their own use subscriptions, grants, or donations of real and personal property not exceeding a fixed amount, or of a limited annual income. In 1819 and the years immediately preceding, these incorporations are very numerous. Index N. H. Laws 468–472; N. H. Mss. Laws, *vols.* 20, 21. These acts being simply acts of incorporation, the limitations contained therein were purely limitations upon corporate power.

The toleration act of 1819 (*c.* 76) was urged not only upon the ground of religious freedom, guaranteed by the constitution but denied in practice, but as a remedy for the abuse of special religious incorporations, which was beginning to be felt. Section 3 of the act provided for the incorporation without special act of societies of each religious sect or denomination of Christians in the state. The act was a general incorporation act as well as an act of religious toleration. This act, like the earlier special incorporations, gave merely the power to raise money by taxation of the members of the societies so incorporated, "and to collect and appropriate the same for the purpose of building and repairing houses of public worship, and for the support of the ministry." The legislation transferred the power conferred upon towns by the act of 1791 to the societies to be formed under it. But the act was seen to be incomplete, and in 1823 (*c.* 60, *s.* 1) such societies were authorized "to collect and receive by voluntary contribution or by devise, and hold for the uses of such society, a permanent fund not exceeding the sum of ten

thousand dollars, the annual income of which shall be appropriated towards erecting or repairing a place of public worship for such society and for the support of the ministry in such society."

The act of July 3, 1827, repealed the acts of July 1, 1819, and July 3, 1823, authorizing the creation of religious societies and defining their corporate powers (Laws, 1827, c. 36, s. 4; Laws, ed. 1830, tit. 99, s. 4), but re-enacted with some modifications and extensions the provisions as to their organization and powers. Section 1 provided that societies organized as provided in the act should be bodies corporate, with power "to take, hold, and possess, to them and their successors, for the use and benefit of such society, by purchase, gift, grant, devise, or otherwise, any real or personal estate, for the purpose of erecting and repairing a house of public worship, and a parsonage house, and other buildings necessarily connected therewith, and for supporting the ministry in such society; and shall have power to improve, sell, and convey and dispose of the same for the sole use and benefit of such society. *Provided always*, that the annual value or income of the estate of any one society shall not at any one time exceed one thousand dollars."

The commissioners who made the revision of 1842 reported with some rearrangement the provisions of the act of 1827, which was entitled "An act empowering religious associations to assume corporate powers," as chapter 147, of title 17 ("Of Corporations"), and it was enacted with some verbal changes as the first five sections of chapter 144 of the Revised Statutes. Section 2 provided that the corporations organized under it "may take, hold, and possess by purchase, gift, grant, devise, or otherwise, any real or personal estate" for purposes stated, "provided that the annual value or income of all the estate of such society shall not exceed two thousand dollars." Up to this point it is clear that the only subject receiving legislative consideration is the property-holding capacity of this class of corporations. In the legislature, title 17 ("Of Corporations") was referred to a special committee of ten who reported a large number of amendments. House Jour., Nov. Sess. 1842, *pp.* 122, 213, 334. In the passage of the act through the legislature, sections 6 to 15 were added to the chapter. These sections are shown, by comparison with chapter 20 of the Revised Statutes of Massachusetts of 1836, to have been taken bodily from that act. In case of a gift or grant to an unincorporated religious society, section 7 makes such society a corporation for the purpose of managing, using, and employing the same, or to prosecute and sue for the same,

and was taken from section 25 of the Massachusetts statute, but contains a provision not found in that section, as follows, "Provided that the income of the donations, gifts, or grants to any one of such unincorporated religious societies shall not exceed the sum of two thousand dollars a year," identical in effect with the like provision as to the holdings of incorporated religious societies under section 2 of the chapter. Section 8 declares that "the trustees, deacons, church wardens, or other similar officers of all churches or religious societies, if citizens of the United States, shall be deemed bodies corporate for the purpose of taking and holding, in succession, all grants and donations, whether of real or personal estate, made either to them and their successors, or to their respective churches, or to the poor of their churches." This section, except for the insertion of the word "trustees" as an additional term descriptive of church officers, is identical with section 39, chapter 20, Revised Statutes of Massachusetts. The remaining sections correspond respectively, with this addition when appropriate, with the remaining sections of the Massachusetts statute. Section 14, upon which the plaintiff relies, is, "The income of any such grant or donation, made to or for the use of any church, shall not exceed the sum of two thousand dollars a year, exclusive of the income of any parsonage lands granted to or for the use of the ministry," and is identical with section 45, chapter 20, Revised Statutes of Massachusetts.

Title 19 of the Commissioners' Report on the Revised Statutes of New Hampshire ("Of Probate and the Estates of Deceased Persons"), which includes chapter 159 ("Wills"), was referred to and reported from the committee on the judiciary. House Jour., Nov. Sess. 1842, p. 126. It would seem to be clear that the legislature of 1842, in dealing with, through a separate committee, and amending the title "Corporations," which included the chapter "Of Religious Societies," must have understood they had corporate power, rather than testamentary capacity, under consideration. That chapter, as completed, provided for the voluntary incorporation of religious societies, with a limitation upon their property-holding power; second, that in case of a gift to an unincorporated religious society, such unincorporated society should have the same power as an incorporated society to hold and control the same, with the same limitation upon the income upon the property authorized to be held, though somewhat differently expressed; and third (ss. 8, 9), recognizing the well understood distinct entity

of church and society (*Holt* v. *Downs*, 58 N. H. 170), and the possibility that a gift might be made to the officers of the church or society, or both, that such officers, as the case might be, should be deemed bodies corporate "for the purpose of taking and holding in succession" all such grants and donations, with the same proviso that the income of such grant or donation should not exceed two thousand dollars a year. The difference in expression arising from copying the Massachusetts language in the latter section does not authorize the conclusion that any different purpose was understood to be attached to the limitation of the income of grants or donations to any church than that intended to be expressed in the proviso of section 2, "that the annual value or income of all the estate of such society shall not exceed two thousand dollars," whose history shows it is nothing more than a limitation of corporate power. The statute appears to have been intended to provide for all possible cases of gifts to religious societies or churches, whether incorporated or unincorporated, and whether the gift be made to the society or church, or to the officers of either or both. The act is comprehensive and complete, and justifies the conclusion of Judge *Smith* in *Hennessey* v. *Walsh*, 55 N. H. 515, 531, before quoted, that "provision is made, whereby defects in a church organization are supplied, so that property donated for pious purposes may not fail of reaching the objects intended by the donors."

In the chapter of the Public Statutes entitled "Religious Societies" (*c.* 152), the first three sections of chapter 144 of the Revised Statutes, providing for voluntary incorporation of such societies, are omitted, though their substance is found in the General Statutes and the General Laws; but in chapter 147 of the Public Statutes, the purpose for which voluntary corporations might be formed is extended to include any charitable or religious cause. Such a corporation may hold property without special authority from the legislature, to the value of five hundred thousand dollars. The present situation of the legislation upon the subject, therefore, is that a religious society or church which incorporates itself under the general law may hold property to the amount of five hundred thousand dollars; and unincorporated religious societies, or the *quasi*-corporations created by gifts to the officers of a society or church, may hold property whose annual income does not exceed five thousand dollars, the limit having been increased since 1842.

Considering these provisions as limitations of corporate power,

there is reasonable ground for permitting greater power to a formally incorporated body than to one whose incorporation results merely from the fact that a gift is made to it or its officers. But a statute intended as a limitation upon testamentary power, with the purpose of preserving an estate for the heirs, which should define the limits of such power, not by the character of the gift or the relation of its amount to the whole property of the decedent, but solely by the amount which could be given to a single corporate entity, varying that by the degree of corporate organization, leaving the testator free to dispose of all his property for pious or superstitious uses by the simple expedient of extending his charity to a sufficiently large number of corporate entities of the same class or by selecting some other as trustee, would be so poorly adapted to execute such a purpose that it cannot be reasonably interpreted as enacted with such end in view. If one view which may be taken of legislative language produces an absurd and unreasonable result, that fact is evidence no such purpose was within the legislative intent, if the language used is capable of a construction neither absurd nor unreasonable. *Opinion of the Justices*, 75 N. H. 613, 616.

Considering all the competent evidence furnished by the language used, the prior history of legislation, the circumstances under which the law was passed, other provisions of apparently similar purpose adopted at the same time, and assigning a reasonable meaning to the language, it is more probable that in 1842 and the subsequent re-enactments of the section relied upon by the plaintiff, the legislative intent was to regulate the property-holding capacity of the *quasi*-corporations created by the act and not to limit the testamentary capacity of the inhabitants of the state. If the New Hampshire statute, by limiting the corporate holding power of a church, indirectly restrains the power of individuals to give directly to such an organization, the restraint relates only to gifts to New Hampshire churches and cannot in any way be construed to limit the testamentary capacity of a New Hampshire citizen to give to other churches. As the gift is not to a New Hampshire church, and as no statute limiting general testamentary power as to gifts for charitable or religious uses is found, the gift is not invalid because of the statute. This disposes of the grounds urged against the validity of the gift in the original bill and, it may be inferred, of the principal objections to the bequest. In the amendments to the original bill and in argument the validity of the bequest as a gift to charitable or religious uses is questioned.

"The rule for determining whether the words of a will create a trust or not is: first, the words must be imperative; second, the subject must be certain; and thirdly, the object must be as certain as the subject." *Goodale* v. *Mooney*, 60 N. H. 528, 533. In this case the subject is certain—all of the testatrix's estate not otherwise disposed of by the will; and that the gift is in trust is distinctly declared. The objects are two-fold: the repair of the church building and another definitely described building of the First Church of Christ, Scientist, in Boston, Massachusetts, and of any building or buildings that may be substituted therefor; and "promoting and extending the religion of Christian Science as taught by me."

The first objection taken to the validity of the gift as a public charity is to the indefiniteness of the language used. It is said that the gift for the repair of the church buildings is invalid, and, as it is impossible to ascertain how much will be required for this purpose, the sum given for the promotion of religion is uncertain. "The statute 43 Eliz., c. 4. (A. D. 1601) contains an enumeration of charitable objects, all of which have since been considered charitable; also many other uses not named within the strict letter of the statute, but which come within its spirit." *Goodale* v. *Mooney*, 60 N. H. 528, 533. "Charitable trusts include all gifts in trust for religious and educational purposes in their ever-varying diversity." *Carter* v. *Whitcomb*, 74 N. H. 482, 486. The repair of churches is one of the charitable objects and purposes specially enumerated in the statute of Elizabeth. 2 Per. Tr., s. 692. "The only reference that the statute makes to religious uses as charitable is to the 'repair of churches.' . . . But in a Christian community, of whatever variety of faith and form of worship, there would be little need of a statute to declare gifts for religious uses to be charitable. Therefore, both before and since the statute, gifts for the advancement, spreading, and teaching of Christianity, or for the convenience and support of worship, or of the ministry, have been held charitable." *Ib.*, s. 701. The inapplicability of the Massachusetts cases cited, which hold that certain conveyances did not constitute public trusts under the control of the attorney-general, is shown by one case cited (*McAlister* v. *Burgess*, 161 Mass. 269) in which it is said (*pp.* 271, 272, 273), "in none of these cases, however, was it contended that the gifts or devises were void," and that the cases are not "authority for the position that a gift for the benefit of a church, *simpliciter*, is not a public charity," while the

case itself explicitly holds that a gift for the benefit of a church is a public charity. The relation of the building No. 385 Commonwealth Avenue, Boston, (the building which is to be kept in repair as well as the church), to church purposes is not disclosed; but being the property of the church, in the absence of allegation to the contrary maintaining it in a state of repair must be assumed to be a benefit to the church. The trust for repair being valid, both trusts created by the residuary clause are to be administered together. "It is no objection to the validity of a charitable gift that it is made up of several parts which are to be administered together, the income to be divided according to the discretion of the trustee." *Haynes* v. *Carr*, 70 N. H. 463, 479; *Webster* v. *Sughrow*, 69 N. H. 380, 383; *Gafney* v. *Kenison*, 64 N. H. 354, 357.

The claim that the expression "the religion of Christian Science as taught by me" constitutes a patent ambiguity is without merit. It may be that without study the term does not present as clear an image to the minds of the court as would either of the terms, Congregational, Episcopal, or Unitarian. But the image, if hazy, is probably more clearly defined than would be that of the recipient of a gift to John Jones, to a mind which had never heard of Jones. But Jones does not lose his legacy because the court does not know him. Neither can the religion of Christian Science be deprived of the gift to promote it because of the court's lack of knowledge, if its identity can be ascertained. "Words cannot be said to be ambiguous because they are unintelligible to a man who cannot read; nor is a written instrument ambiguous or uncertain merely because an ignorant or uninformed person may be unable to interpret it. It is ambiguous only when found to be of uncertain meaning by persons of competent skill and information. Neither is a judge at liberty to declare an instrument ambiguous because he is ignorant of a particular fact, art, or science, which was familiar to the person who used the words, and a knowledge of which is therefore necessary to a right understanding of the words he has used. . . . No judge is at liberty to pronounce an instrument ambiguous until he has brought to his aid, in its interpretation, all the lights afforded by the collateral facts and circumstances." 1 Gr. Ev., s. 298. A gift having been made for the benefit of needy members of churches forming upon the apostolical doctrines brought forward by the late Edward Irving, a reference was directed to inquire what those doctrines were and to ascertain other facts neces-

sary to the interpretation of the will and the establishment of the trust. *Attorney-General* v. *Lawes*, 8 Hare 32.

The bill concedes the existence of the First Church of Christ, Scientist, as a religious society "based upon Christian Science which originated in the year 1866," and that the church embraces about fifty thousand members widely distributed, and sets out a portion of the Church Manual, from which it appears that in April, 1879, Mrs. Eddy and her followers voted "to organize a church . . . which should reinstate primitive Christianity and its lost element of healing," that the church itself was organized December 23, 1892, and that the doctrines of Christian Science are to be ascertained from a book published by Mrs. Eddy, called Science and Health with Key to the Scriptures, the Church Manual, and other publications. The Church Manual, which is thus by reference made a part of the bill, has been furnished the court and contains the tenets or creed of the church to be signed by those uniting therewith. This declares the inspired word of the Bible as a sufficient guide to eternal life, acknowledges the existence of God, his son Christ, and the Holy Ghost, God's forgiveness of sin, the atonement of Jesus, his crucifixion and resurrection. It is also alleged in the bill that this church was organized for the promotion of the doctrines of Christian Science—the purpose of the bequest under consideration. "The very term church imports an organization for religious purposes." *Baker* v. *Fales*, 16 Mass. 488, 495. In the light of the admissions of the bill, it is unnecessary to consider whether as the case is presented the court should or could take judicial notice of the believers in Christian Science as a sect or denomination of Christians, because the bill admits the existence of a body of at least fifty thousand members organized for religious purposes and united in a belief claimed to be founded upon the truth of the Bible and the revelations of the New Testament. As it is conceded the religion of Christian Science founded by Mrs. Eddy exists, there is no want of definiteness as to what she meant by "the religion of Christian Science as taught by me."

While courts may not often be called upon to investigate the doctrines of a particular religion, if it becomes necessary to do so to see that a trust is administered according to the intention of its creator, they do not hesitate to undertake the task. If necessary, no reason occurs why the "tenets" of Christian Science may not be as readily passed upon as the creed of Congregationalism or the faith of Unitarianism. *Dublin Case*, 38 N. H. 459;

*Hale* v. *Everett*, 53 N. H. 9. Its briefer history would probably render much less extensive the necessary investigation. But as already suggested, the administration of the trust does not concern the plaintiff.

The ingenious and extended argument of the counsel for the plaintiff in support of the claim that this trust is invalid because too indefinite loses sight of the fact that the gift here is to trustees, whose discretion the testatrix intended should determine the manner in which the gift should be applied to effect her charitable purpose, and thereby the gift is relieved of the uncertainty which otherwise might defeat it. 2 Per. Tr., *ss.* 720, 732. If there are authorities to the contrary, they are not followed here. *French* v. *Lawrence, ante,* 234; *Haynes* v. *Carr,* 70 N. H. 463; *Goodale* v. *Mooney,* 60 N. H. 528. The argument also omits to consider that a gift for the benefit of the public generally is valid. 2 Per. Tr., *s.* 704; Bisp. Eq., *ss.* 59, 123. Where the benefit intended is one in which all mankind may share, it is not necessary that some smaller class of humanity be selected. "An establishment for the increase of knowledge among men" (*President of United States* v. *Drummond,* cited in 7 H. L. C. 155), "for the benefit, advancement, and propagation of education and learning in every part of the world" (*Whicker* v. *Hume,* 7 H. L. C. 123; *Russell* v. *Allen,* 107 U. S. 163, 172), "the furtherance and promotion of the cause of piety and good morals" (*Saltonstall* v. *Sanders,* 11 Allen 446), "for the preaching of the gospel of the blessed Son of God, as taught by the people known now as Disciples of Christ" (*Sowers* v. *Cyrenius,* 39 Ohio St. 29), "for the advancement and benefit of the Christian religion" (*Miller* v. *Teachout,* 24 Ohio St. 525), are examples of valid trusts whose benefits were not limited to a particular class. The beneficiaries of the trusts for printing and publishing the works of Joanna Southcote (*Thornton* v. *Howe,* 31 Beav. 14), or of Henry George (*George* v. *Braddock,* 45 N. J. Eq. 757), could only be those who might read the published volumes, or the general public because of the common advantage resulting from the dissemination of the doctrines therein advocated.

It may be conceded that if the will permits the trustees, in their discretion, to apply the whole or a portion of the fund to objects which are not charitable, the gift is void. *Goodale* v. *Mooney,* 60 N. H. 528. The application of the numerous cases cited by counsel to this proposition is not perceived. No objects are within the purview of the bequests except the repair of the church

buildings and the extension of the religion of Christian Science. If the trustees attempt to apply the fund to other objects, they will violate the trust committed to them. The argument seems to be that it will be possible to promote and extend Christian Science by means that are not charitable. This means (if it means anything) that in the administration of the trust the money may be paid out to persons who are not and who could not be beneficiaries. This is true in all cases where the trust is not performed by delivery of the money directly to the beneficiaries. The latter is rarely the case. To execute the trust for the advancement of Christianity among infidels (*Attorney-General* v. *London*, 1 Ves. Jr. 243) it could not have been required that the money should be paid to the infidels. Conversion by purchase was not the purpose. In keeping the church in repair the purchase of the necessary materials in the open market would not be an application of the fund to a purpose not charitable, even if the transaction were beneficial to those dealing in such articles. It is the purpose of the expenditure—whether the act has any reasonable prospect of promoting the object of the trust—which must be the test which limits the power of the trustees. The claim that there is a distinction between the promotion of piety and of religion is not sustained by any authorities. The two words are used as synonymous. *Going* v. *Emery*, 16 Pick. 107; Bisp. Eq., s. 122. If there is a distinction from the derivation of the words, in some uses, between duty to man and duty to God as well as our fellows (Soule Eng. Syn. 311, 349), there is no distinction in the meaning in common use by which to test the validity of a charity.

The next contention is that the purpose of the gift is the pecuniary profit of the donee. This is not a fact admitted by the demurrer, but a legal conclusion to be drawn from the will under the circumstances competent for consideration. Assuming that it is sufficiently alleged that the promotion of Christian Science is in some sense a business owned and carried on by the First Church of Christ, Scientist, that fact does not destroy its charitable character. Dartmouth College is in a sense a business. It receives between one and two hundred thousand dollars annually for tuition. It may be said to be in the business of selling education to that extent yearly. But that fact does not destroy its character as a public charity. The reason is the absence of private ownership. It is not alleged that any persons, as stockholders or private owners of the First Church of Christ, Scientist, are entitled to personal

profit from its alleged business. The allegations all point in the opposite direction: that as a voluntary religious organization its property is all held for the charitable purposes of the association. If the necessary effect of promoting Christian Science were to enrich its private owners, the gift could not be sustained as a charity. *Haynes* v. *Carr*, 70 N. H. 463, 483. The facts essential to such conclusion are not alleged. The case is here on demurrer, and if material facts have been omitted the plaintiff will be permitted to amend.

The allegation that Christian Science is not a religion, but a system of faith-cure for disease, does not help the plaintiff. Whether the extension and promotion intended is of a religion, or a system of therapeutics, or a combination of the two,—whether it aims to benefit mankind by ensuring their happiness in a future state, or by rendering their existence more tolerable in this world,— it is equally a gift for a general public use and within the definition of Judge *Gray* in *Jackson* v. *Phillips*, 14 Allen 539, 556: A gift "for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, [or] by relieving their bodies from disease, suffering, or constraint." Even if Mrs. Eddy's scheme were merely educational, if it were such that she might legally publish and promote it in her lifetime, there would be no legal objection to gifts by herself or others to extend and promote it by publishing her writings, or by other lawful means, after her death. *Thornton* v. *Howe*, 31 Beav. 14.

"By 'public policy' is intended the policy of the state as evidenced by its laws. When the issue is its policy in respect to any question, the only matters which can be considered are its constitution and statutes and the provisions of the common law as evidenced by the decisions of its courts; for the common law, as modified by the statutes of the state, is the law of the state." *Spead* v. *Tomlinson*, 73 N. H. 46, 58, and authorities cited. "The question what is the public policy of a state, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ." *Vidal* v. *Girard*, 2 How. 127, 197. When, therefore, it is said that "the residuary bequest is void because it is contrary to the public policy of this state," the meaning must be either that the promotion and

extension of the religion of Christian Science as taught by Mrs. Eddy is forbidden by the law of the state, or that it is impossible to promote or extend it except by unlawful methods. If the object itself is lawful and may be accomplished by lawful methods, it is no objection that unlawful methods might be employed for such purposes; for it will not be inferred, unless expressly declared, that unlawful means were intended to be employed. *Jackson* v. *Phillips*, 14 Allen 539. Here the means to be employed are left to the discretion of the trustees. The use of unlawful methods by them would be a violation of their trust.

With the truth of the religious theories inculcated the court has no concern. Even if, upon examination of Mrs. Eddy's writings, the members of the court should entertain the opinion expressed by *Sir John Romilly* of Joanna Southcote in *Thornton* v. *Howe,* and believe her to be "a foolish, ignorant woman," and her teachings absurd and illogical delusions, the personal opinions of the members of the court would not affect the question. Mrs. Eddy had the constitutional right to entertain such opinions as she chose, and to make a religion of them, and to teach them to all others; and their rights of belief are as extensive as hers. Her legal right to teach was not ended with her death. She might dispose of her property by a gift in public charity "for any use that is not illegal." Whether her opinions are theologically true, "the court are not competent to decide." *Dublin Case,* 38 N. H. 459, 510. "To suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty; . . . it is time enough for the rightful purposes of civil government, for its officers to interfere when principles break out into overt acts against peace and good order." 12 Henings Stat. Va. 84, quoted in *Reynolds* v. *United States,* 98 U. S. 145, 163. "Whilst legislation for the establishment of a religion is forbidden and its free exercise permitted, it does not follow that everything which may be so called can be tolerated. Crime is not less odious because sanctioned by what any particular sect may designate as religion." *Davis* v. *Beason,* 133 U. S. 333, 345; *State* v. *White,* 64 N. H. 48, 50. "Every individual has a natural and inalienable right to worship God according to the dictates of his own conscience and reason, . . . provided he doth not disturb the public peace, or disturb others in their religious worship." Bill of Rights, *art. 5; Hale* v. *Everett,* 53 N. H. 9, 61.

With the worship of God according to the belief of Christian Science no fault is found.

It is not suggested that Mrs. Eddy's teachings lead to immorality or irreligion, or tend to a breach of the peace or to disturb the religious worship of others. As mere belief cannot constitutionally be made a crime, the only possibility of offence must be looked for in some overt act necessarily resulting from, or peremptorily inculcated as part of, her system. That act is claimed to be found in the cure of disease without drugs or instruments, which may be said to be an essential element of a belief founded on the re-discovery of the lost art of healing exhibited in the miraculous cures of Jesus Christ recounted in the New Testament. The allegations upon this point are found in paragraphs numbered 5 and 25 in the bill, with the further reference to the contents of the book Science and Health before referred to. In this connection it seems necessary again to remark that it is only facts duly alleged that are admitted by the demurrer. Allegations as to what the plaintiff is advised by his counsel, or as to the conflict of Mrs. Eddy's teachings with "the great body of common, statute, and municipal law designed to improve and preserve the health and save and lengthen the lives of the people," are merely arguments. The material facts are: what overt acts are committed under and in pursuance of Mrs. Eddy's teachings? These being presented, whether they are in violation of law is for the court.

Paragraph 5 sets out the existence of a band of about five thousand Christian Science practitioners, who claim to heal all manner of diseases practicing upon the following principles: "(1) That no medicines whatever shall be given, and (2) no physical act performed; (3) that the treatment can be carried on as well when the practitioner is absent from the patient as when he is present; and (4) that the healing is effected solely by the exercise of Christ's divine power of working miracles, which disappeared after two or three centuries, but was rediscovered by the testatrix and by her taught to her disciples." The mode of procedure is more fully elaborated in paragraph 25, the short of which is that the cures claimed to be effected are produced by mental effort through some mysterious action of the book Science and Health. In short, as counsel describe it, Mrs. Eddy teaches, and her disciples have practiced, a system of faith-cure for disease—a system of mental therapeutics. It is also alleged that the system taught by this book denies and reprobates all scientific, preventive, and remedial medi-

cine.   In paragraph 27, it is again alleged that the treatment prescribed must be purely mental.

If the court have legislative power to make the law, the natural inquiry would be: what are the results of the system?   Five thousand practitioners collecting five million dollars yearly must have done some business—treated some cases.   Have the pu'·lic been helped or harmed thereby?   The only allegations (paragraph 16) are that the system "has been tried upon a large scale, and in many cases has prevented sick persons and young children from being properly treated by regular physicians," reiterated in substance in other paragraphs.   In argument, counsel has given a history of two cases where the system was applied with disastrous results.   It does not seem necessary to undertake an extensive discussion of Mrs. Eddy's theories as set forth in her writings, because the system may be reduced to the simple principle of treatment of disease without the use of drugs or instruments, or its extirpation by belief in its non-existence.   Is the system against the policy of the state? Is it a crime to attempt to cure physical ills without drugs or surgery?   The close association between mental health and physical ills in many cases is common knowledge.   The plaintiff does not attempt to say no good has been effected by the system.   His distinguished counsel candidly admitted in argument that Mrs. Eddy had done great good; that there were many cases of at least apparent or supposed disease which her system had relieved; but his objection was that she went too far when she professed to be able to cure or extirpate all disease.

Bulletin 30, a Report on National Vitality by Prof. Irving Fisher (a government publication cited by the plaintiff), has been furnished the court.   In it (*pp.* 67, 68) the author comments upon the public demand for "drugless treatment" and criticises physicians who fail to see and meet that demand as far as it is rational.   He says: "The public will go and should go to those who will render the most effective help.   .   .   .   There is a quackery that is villainous and injurious.   This should be suppressed.   But there is another quackery which is well-intentioned and which in spite of ignorance manages to do some good.   The good in it should be appropriated by the profession.   By always promptly absorbing the best, the profession will be in a position to cast out the worst in 'irregular' systems of therapeutics.   It may then recover the ground which it has too often lost.   There was no reason why it should have lost hundreds of thousands of patients to Christian

Science, except that these patients were for the most part benefited, and greatly benefited, by Christian Science after having received no benefit, often injury, from the profession. 'Easily, physicians, without knowing it, can produce sickness by pessimistic prophecies, by anxious looks or words.' Had the profession made use of mental therapeutics, not only could they have saved themselves the enmity of these hundreds of thousands, but they could have nipped in the bud the crude metaphysics which teaches the non-existence of disease and death and the uselessness of any therapeutic agent except those employed by the promulgator."

The beneficial effects to some extent in some diseases appearing by the absence of denial in the bill, the admissions of counsel in argument, and the authorities furnished the court by them, the case would seem to be one for regulation, either as to the cases in which the system might be used, or the intelligence and education of its practitioners, rather than one requiring absolute prohibition, if law were needed upon the subject. But "it must be remembered that the law-making power of the state . . . is alone invested with the authority and must determine its public policy. With this power the courts have not been entrusted. It is for them to ascertain and apply the law and the legislative policy, and not to inaugurate it." *Carroll* v. *East St. Louis*, 67 Ill. 568, 571. "It is not within the power of any court, state or federal, to prescribe what rules and regulations are needful to the welfare, peace, health, safety, and morals of the state." *State* v. *Coal Co.*, 96 Fed. Rep. 353, 368; *People* v. *Hawkins*, 157 N. Y. 1, 12.

What is the law of the state, as shown by specific enactments or the general course of legislation, as to the prohibition or regulation of the practice of Christian Science? March 16, 1897, the legislature passed an act to regulate the licensing and registration of physicians and surgeons, with stringent provisions for the examination and regulation of persons proposing to practice medicine or surgery. Laws 1897, c. 63. By section 11 of the act, persons practicing "Christian Science, so called," were expressly excluded from its restrictions. It thus appears that the practice of Christian Science was brought to the attention of the legislature fifteen years ago, and that neither at that time nor at any time since has the legislature considered the public good required its practice should be prohibited or regulated. No inference can be drawn except that in the opinion of the legislature restrictive legislation is not required. This conclusion of the legislature binds the court.

No person could be convicted of crime upon an indictment charging the practice of Christian Science healing, because there is no law which forbids it.    Whether a Christian Science practitioner may be found guilty of negligence for unsuccessfully attempting to treat disease, in a suit by the state (*Spead* v. *Tomlinson*, 73 N. H. 46, 59, 60), is a different question.    The law permits and regulates the practice of medicine and surgery by express provisions.    Laws 1897, c. 63.    The possession by the respondent of a license to practice medicine and surgery, duly issued under that act, would not be an answer to an indictment for manslaughter through culpable negligence, under section 8, chapter 278, Public Statutes.    That a Christian Science practitioner might be liable under the same statute does not establish that the practice of Christian Science is forbidden by law.    Nor does Mrs. Eddy teach that all persons believing in the principles of Christian Science are competent to heal all diseases by drugless treatment. Science and Health 459, 460.    If she believed all disease was a mere erroneous mental conception, curable by correcting the mental error, she did not teach that all Christian Science practitioners could cure all diseases in all persons.    "If patients fail to experience the healing power of Christian Science and think they can be benefited by certain ordinary physical methods of medical treatment, then the mind-physician should give up the case."    Science and Health 443; Church Manual 47.    The plaintiff has not called attention to any statute which the practice of Christian Science contravenes.    The defendants cite section 2, chapter 16, Laws 1901, requiring any person knowing or having reason to believe that a person in any of certain relations to him has any malignant communicable disease to give notice to a health officer.    Nothing in Mrs. Eddy's teachings has been pointed out requiring her disciples to violate this law, and it is unnecessary to recite the passages set out in the defendants' brief advising obedience to the laws of the land.

The truth of Mrs. Eddy's science or religion is not to be determined by the court.    As a religion, she had the right to believe and teach it.    If the scientific principles she believed in run counter to the general belief of the time, she had equal right to believe and teach them.    In the absence of legislative reprobation found in express enactment or in the general course of the legislation of the state, action in accordance with her teachings is not illegal.    As neither her belief nor the acts under it are necessarily illegal, the

trust to promote the principles she attempted to inculcate is not illegal.

Upon the facts before the court, the residuary clause creates a valid trust.   Unless the plaintiff amends his bill, the executor should be advised to pay over the balance of the estate to trustees found duly qualified and appointed by the probate court.   With this decree the plaintiff's petition should be dismissed.

*Case discharged.*

WALKER, J., did not sit: the others concurred.