NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Coos
No. 2019-0171

THE STATE OF NEW HAMPSHIRE

v.

JEREMY D. MACK

Argued: February 13, 2020
Opinion Issued: December 22, 2020

Gordon J. MacDonald, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.

Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. Following a jury trial in Superior Court (Bornstein, J.), the defendant, Jeremy D. Mack, was convicted on one count of possession of a controlled drug: psilocyn and/or psilocybin, see RSA 318-B:2, I (2017); RSA 318-B:1-a, I (2017); N.H. Admin. R., He-C 501.03(a) (incorporating by reference the federal schedules of controlled substances, 21 C.F.R. §§ 1308.11-15 (2019), into the New Hampshire Controlled Drug Act), which he possessed in the form of mushrooms. On appeal, the defendant argues that, because Part I, Article 5 of the New Hampshire Constitution protects his right to possess and use mushrooms as part of his religious worship, so long as he does not "disturb the public peace," the trial court erred by denying his pre-trial motion to dismiss. This appeal requires us to interpret Part I, Article 5, which provides:

> Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience, and reason; and no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession, sentiments, or persuasion; provided he doth not disturb the public peace or disturb others in their religious worship.

N.H. CONST. pt. I, art. 5. Specifically, the outcome of this appeal turns on our interpretation of the phrase "disturb the public peace." Because we now articulate the test required by Part I, Article 5, we vacate the trial court's order and remand.

The pertinent facts are as follows. In 2017, the defendant, after practicing "[s]hamanic, earth-based religion" for years, joined the Oratory of Mystical Sacraments branch of the Oklevueha Native American Church. After joining the church, the defendant was issued a membership card specifying that he "met the standard of being a sincere member of the Native American Church," which qualified him to grow and use mushrooms as a religious sacrament in accordance with the church's rules. The defendant testified that the church has strict rules surrounding the taking of the sacraments, which must be done in seclusion. The defendant further testified that the rules prohibit taking mushrooms in public or around children, and also prohibit the operation of vehicles and the use of firearms while doing so. After joining the church, the defendant completed additional training and became a minister within the church.

In November 2017, two New Hampshire State Police troopers went to the defendant's home to serve him with an order of protection arising out of an unrelated civil matter pending in another state. The order required the troopers to take custody of any firearms owned by the defendant. Although the defendant was not at home, his mother, who lived with him, allowed the troopers into the residence. Speaking with the troopers on the telephone, the defendant gave the troopers permission to take custody of his firearms, which were located in a safe in the basement of his home. When the troopers opened the safe, they observed mushrooms on the top shelf, and seized them.

Approximately one week later, the defendant voluntarily met with one of the troopers at the Colebrook Police Department. During the meeting, the defendant explained to the trooper that he possessed and used the mushrooms as part of his religious worship, and that he did so in accordance with the rules of the Oklevueha Native American Church. He further explained his belief that it was legal for him to do so as part of his religious worship, based on his

2

understanding of certain out-of-state court rulings and other legal information provided by the church.

In April 2018, the defendant was indicted on one count of possession of a controlled drug. See RSA 318-B:2, I. In July 2018, the defendant moved to dismiss the indictment on the grounds that it violated his right to freely exercise his religion under the First Amendment to the United States Constitution, and Part I, Article 5 of the New Hampshire Constitution. See U.S. CONST. amend. 1; N.H. CONST. pt. I, art. 5. The State objected. Following a hearing in September 2018, the trial court denied the defendant's motion to dismiss.

In its order, the trial court considered the defendant's claims under both the Federal and State Constitutions. The trial court observed that, prior to the decision of the United States Supreme Court in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), superseded by statute, Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, any law that substantially burdened religious conduct was deemed to violate the Free Exercise Clause of the First Amendment unless the law was shown to serve a compelling government interest. In Smith, the Supreme Court dispensed with the "compelling government interest" test, and held that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Employment Div., Ore. Dept. of Human Res. v. Smith, 494 U.S. at 879, 885-90 (quotation omitted). Accordingly, the trial court determined that, under the Federal Constitution, "the State is not required to show a compelling government interest" because "the state law making it illegal to possess a controlled drug in the State of New Hampshire is a facially neutral law that applies to every person in the State regardless of the person's religious beliefs or lack thereof."

With regard to the State Constitution, the trial court observed that we had employed the reasoning from Smith in a free exercise case involving Part I, Article 5: State v. Perfetto, 160 N.H. 675, 679 (2010). Finding that, in Perfetto, we had adopted Smith, the trial court applied the same reasoning as it had under the Federal Constitution, and denied the defendant's motion to dismiss, concluding that "the defendant's possession of psilocyn and/or psilocybin is prohibited under New Hampshire law, and because that prohibition is constitutional, the State may, consistent with the [federal] Free Exercise Clause and Part I, Article 5 of the New Hampshire Constitution, prosecute the defendant for said possession." The trial court denied the defendant's motion to reconsider, and the defendant was later convicted by a jury. This appeal followed.

3

On appeal, the defendant does not advance any appellate arguments under the Federal Constitution; rather, he argues that the trial court erred by denying his motion to dismiss under Part I, Article 5 of the New Hampshire Constitution. The defendant contends that the plain language and original meaning of Part I, Article 5 bar the State "from prosecuting an individual for worshipping God in the manner and season most agreeable to the dictates of his own conscience, except for conduct that disturbs the public peace or disturbs others in their religious worship." (Quotations and brackets omitted.) The defendant contends that his possession and use of mushrooms did not "disturb the public peace" within the original meaning of Part I, Article 5. He argues that the State Constitution provides greater protection to religious conduct than the Federal Constitution, and that we did not and should not adopt Smith because it is contrary to the plain language and original meaning of Part I, Article 5. The State does not dispute that the defendant's possession and sacramental use of mushrooms constitutes religious conduct motivated by a sincerely held religious belief.

We first consider the State's threshold contention that the defendant failed to preserve his arguments regarding the original meaning of Part I, Article 5 and the applicability of Smith. See Halifax-American Energy Co. v. Provider Power, LLC, 170 N.H. 569, 574 (2018) (observing that we generally "decline to review any argument that the defendants did not raise before the trial court" (quotation omitted)). From the outset, the defendant has maintained that his conduct is protected by Part I, Article 5, provided that he does not disturb the public peace or disturb others in their religious worship. Additionally, with regard to Smith, the trial court relied heavily on that decision in its order, and the parties had advanced arguments regarding Smith in their pleadings and during the hearing on the defendant's motion to dismiss. Accordingly, we find that the defendant's arguments are preserved for our review.

We now turn to the merits of the defendant's arguments. As we noted at the outset, the defendant's arguments require us to interpret Part I, Article 5, and, in particular, the "disturb the public peace" clause. If, as the State contends, we adopted Smith in Perfetto, then the application of Smith would be dispositive. Accordingly, we examine Perfetto.

In Perfetto, the defendant entered into a plea agreement whereby he pled guilty to numerous counts of possession of child pornography. Perfetto, 160 N.H. at 676. As part of his plea agreement, the defendant was prohibited from having contact with minors under the age of seventeen. Id. at 676-77. Following his release from state prison, the defendant moved to amend that condition — which was a part of his remaining suspended sentences — so that he could attend meetings at a particular congregation of Jehovah's Witnesses. Id. The trial court denied his motion. Id. at 677.

4

On appeal, the defendant argued that "by not amending the conditions of his suspended sentences to allow him to attend the congregation of his choice, he [was] deprived of the right to the free exercise of his religion." Id. In affirming the trial court, we observed that "[t]o remain at liberty under a suspended sentence is not a matter of right but a matter of grace," and that the defendant, like "probationers, . . . parolees and prisoners," was "properly . . . subject to limitations from which ordinary persons are free," as long as the "limitations in the aggregate . . . serve the ends of probation." Id. at 678 (quotations and brackets omitted). Further, we noted that "a court will not strike down conditions of release, even if they implicate fundamental rights, if such conditions are reasonably related to the ends of rehabilitation and protection of the public from recidivism." Id. at 678 (quotation omitted).

Additionally, in declining the defendant's invitation to require the State to show a compelling government interest in order to justify imposing restrictions on a probationer's fundamental rights, we noted that "the condition in this case does not directly infringe on the defendant's free exercise of his religion: it is instead facially neutral and applies to the defendant's conduct regardless of whether he is in a church or elsewhere." Id. at 678-79. We then concluded that "[u]nder these circumstances, we see no reason to require the State to show a compelling government interest." Id. at 679. We cited Smith for the proposition that "facially neutral, generally applicable laws that incidentally touch upon an individual's free exercise of religion do not require the government to show a compelling interest." Id.

We did not adopt the reasoning of Smith in Perfetto — the case did not require that we either adopt or reject the Smith analysis. The dispositive principle in Perfetto was that the defendant, like "probationers, . . . parolees and prisoners," was "properly . . . subject to limitations from which ordinary persons are free." Id. at 678 (quotations and brackets omitted). Because "the suspension condition [was] reasonably related to the rehabilitation or supervision of the defendant," the condition did not improperly deprive him of the right to freely exercise his religion. Id. at 680. Having so found, we had no occasion to decide whether the reasoning from Smith would be consonant with Part I, Article 5 of the State Constitution.[1]

---

[1] In Perfetto, our single citation to Smith was introduced with a "Cf." signal, which means "compare," and is used in legal writing when the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support." The Bluebook: A Uniform System of Citation R. 1.2(a), at 59 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015). We cited Smith merely to support our conclusion that, under the particular circumstances presented in Perfetto, there was no need for the State to show a compelling government interest. See Perfetto, 160 N.H. at 678-80.

Moreover, Perfetto is distinguishable on its facts.  Here, the defendant is not subject to a suspended sentence, nor is he a probationer, parolee, or prisoner.  Accordingly, the defendant, as an "ordinary person[]," is not subject to restrictions on his religious freedom unless those restrictions pass muster under Part I, Article 5.  See id. at 678.  In Perfetto, we observed that the defendant "may still practice his religion in ways that do not violate the condition of his sentences," such as through "the use of books and video and audio recordings," or by "arrang[ing] bible study with elders from his congregation," or even by "attend[ing] meetings at a congregation where minors are not present."  Id. at 679-80.  Here, however, the defendant does not have an alternative means of engaging in this religious ritual — he is categorically prohibited from possessing or using psilocyn and/or psilocybin mushrooms.  See RSA 318-B:2, I.

Having concluded that, in Perfetto, we did not adopt Smith, and that Perfetto itself does not control the outcome here, we must now consider the broader and fundamental question presented by this appeal: whether the defendant's possession and use of psilocyn and/or psilocybin mushrooms is protected by Part I, Article 5 of the State Constitution.  The defendant argues that, because he was "worshipping God in the manner and season most agreeable to the dictates of his own conscience," and because his conduct did not "disturb the public peace," Part I, Article 5 bars the State from prosecuting him. (Quotations omitted.)  The State counters that Part I, Article 5 does not protect the defendant's conduct because "disturb the public peace," as used in Part I, Article 5, means "violate a generally applicable law." (Quotation omitted.)

"As the final arbiter of state constitutional disputes, we review the trial court's construction of constitutional provisions de novo."  HSBC Bank USA v. MacMillan, 160 N.H. 375, 376 (2010).  "When our inquiry requires us to interpret a provision of the constitution, we must look to its purpose and intent.  The first resort is the natural significance of the words used by the framers.  The simplest and most obvious interpretation of a constitution, if in itself sensible, is most likely to be that meant by the people in its adoption."  Duncan v. State, 166 N.H. 630, 640 (2014) (quotations and citations omitted).  Additionally, "we view the language used in light of the circumstances surrounding its formulation."  City of Concord v. State of N.H., 164 N.H. 130, 134 (2012).  "Reviewing the history of the constitution and its amendments is often instructive, and in so doing, it is the court's duty to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in light of the surrounding circumstances."  State v. Addison (Capital Murder), 165 N.H. 381, 565-66 (2013) (quotation omitted).  "The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the

6

time when the constitution and the laws were adopted." Id. at 566 (quotation, brackets, and ellipsis omitted).

Additionally, when interpreting the New Hampshire Constitution, we often look to interpretations of comparable state and federal constitutional provisions in order to inform and guide our analysis. State v. Briand, 130 N.H. 650, 653 (1988). Interpretations by other courts are most persuasive when the language of the constitutional provision at issue is similar to the wording in our constitution. See, e.g., Opinion of the Justices (Quorum under Part II, Article 20), 173 N.H. __, __ (decided November 17, 2020) (slip op. at 5) (finding the history of the Federal Quorum Clause instructive "[b]ecause of the similarity in language" between the Federal Quorum Clause and the quorum clause of the New Hampshire Constitution). When "the constitutional provision[] at issue contain[s] language dissimilar to ours," interpretations by other courts are of more "limited value." Claremont School Dist. v. Governor, 138 N.H. 183, 186 (1993). "Given that New Hampshire shares its early history with Massachusetts, that we modeled much of our constitution on one adopted by Massachusetts four years earlier, and that the Massachusetts Constitution contains a nearly identical provision regarding" the free exercise of religion, "we give weight to the interpretation given that provision by the [Massachusetts] Supreme Judicial Court." Id. It is important to note, however, that "when this court cites federal or other State court opinions in construing provisions of the New Hampshire Constitution or statutes, we rely on those precedents merely for guidance and do not consider our results bound by those decisions." State v. Ball, 124 N.H. 226, 233 (1983).

Part I, Article 5 was part of the New Hampshire Constitution of 1784, and remains unchanged to this day. See 20 Early State Papers of New Hampshire 10 (A. Batchellor ed. 1891). We have long recognized that in Part I, Article 5, "there is a broad, a general, a universal statement and declaration of the 'natural and unalienable right' of 'every individual,' of every human being, in the state, to make such religious profession, to entertain such religious sentiments, or to belong to such religious persuasion as he chooses, and to worship God privately and publicly in the manner and season most agreeable to the dictates of his own conscience and reason." Hale v. Everett, 53 N.H. 9, 61 (1868). "And," we observed, "if he do it in a way not to disturb others, that right is without exception and without qualification." Id. (emphasis added). As we explained: "The framers of the constitution were very careful to state and declare the distinction between mere civil or political rights, although they were 'natural, essential, and inherent' rights belonging to 'all men' (Art. II), and the 'rights of conscience,' which had the additional quality and excellence of being 'unalienable.'" Id. "These merely civil or political rights could be surrendered to the government or to society (Art. III) in order to secure the protection of other rights, but the rights of conscience could not be thus surrendered," we continued, nor could the government or society "have any claim or right to

assume to take them away, or to interfere or intermeddle with them, except so far as to protect society against any acts or demonstrations of one sect or persuasion which might tend to disturb the public peace, or affect the rights of others." Id. Indeed, we observed that such rights of conscience are not "conferred" by the State Constitution, but, rather, are "declared, stated, asserted, as something inherent in the people—a right they had before this declaration of rights, as much as after." Id. at 60. We have reaffirmed these principles over the years. See, e.g., Glover v. Baker, 76 N.H. 393, 420-21 (1912); State v. Cox, 91 N.H. 137, 141-42, 145-46 (1940); Opinion of the Justices (Choice in Education), 136 N.H. 357, 359 (1992).

Here the defendant "had the constitutional right to entertain such opinions as [he] chose, and to make a religion of them." Baker, 76 N.H. at 420. "Whether [his] opinions are theologically true, the court[s] are not competent to decide." Id. (quotation omitted). Indeed, "[i]n this country there is absolute religious equality, and no discrimination in law is made between different religious creeds or forms of worship." Webster v. Sughrow, 69 N.H. 380, 381 (1898). Because, in this case, the State does not dispute that the defendant's possession and sacramental use of mushrooms constitutes religious conduct motivated by a sincerely held religious belief, the critical question is whether the defendant's "worshipping [of] God in the manner and season most agreeable to the dictates of his own conscience" "disturb[ed] the public peace" within the meaning of Part I, Article 5. N.H. CONST. pt. I, art. 5 (emphasis added).

We begin with a survey of our case law interpreting the phrase "disturb the public peace." N.H. CONST. pt. I, art. 5. In State v. White, the defendants were charged and convicted of beating a drum, without advance permission, within the compact part of a town in violation of a statute "designed for the security of the public convenience, safety, and tranquillity." State v. White, 64 N.H. 48, 49 (1886). On appeal, the defendants argued that their actions were protected by Part I, Article 5 because their actions were done in accordance with their sense of religious duty, and, therefore, they were worshiping in accordance with the dictates of their own consciences. Id. In holding that it was not a legal justification "that the act was done in the performance of religious services in accordance with the religious belief of the [defendants]," id., we reasoned that, although Part I, Article 5 secures to every person "unlimited freedom of conscience and religious belief and profession," it "affords no justification for acts or practices in religious services which disturb the public peace, or disturb others in their religious worship." Id. at 50.

We went on to explain that "a statute prohibiting acts having a tendency to endanger the public peace, or to distract the attention and interrupt the quiet of others, is not in conflict with this constitutional provision, although the prohibited acts may form a part of the services of religious worship." Id.

8

"Religious liberty, as recognized and secured by the constitution," we continued, "does not mean a license to engage in acts having a tendency to disturb the public peace under the form of religious worship, nor does it include the right to disregard those regulations which the legislature have deemed reasonably necessary for the security of public order." Id. Accordingly, we concluded that "[a] reasonable measure of prevention to avoid disturbance is not an infringement of constitutional rights." Id.

In State v. Cox, each of the defendants was convicted of a misdemeanor for taking part in a procession on the public streets of Manchester without a license, as required by statute. Cox, 91 N.H. at 138. The defendants were members of a group of more than eighty Jehovah's Witnesses who participated in an "information march" throughout the city, carrying signs and placards, and distributing leaflets. Id. at 138-39. On appeal, the defendants challenged the constitutionality of the statute under Part I, Article 5, and under Part I, Article 22 (liberty of the press) of the State Constitution. Id. at 140. Quoting White, we recognized that "[t]he state has authority to make regulations as to the time, mode, and circumstances under which parties shall assert, enjoy, or exercise their rights of highway use without coming in conflict with any of those constitutional principles which are established for the protection of private rights and private property," and that such regulations "are valid if they reasonably serve to prevent any substantial disturbance which is an interference of normal travel." Id. at 141-42 (quotation and brackets omitted). Therefore, reasoning that "[t]he right to worship is not a right to disturb others in their worship, and the right to free speech and writing is not one to force speech or writing on an unwilling audience or readers," we found that "[i]t is not unreasonable to say that the sentiment displayed had a provocative tendency to a disturbance of the peace in view of the manner, place and time of its publication." Id. at 145-46. After observing that the defendants were entitled to, but did not, apply for a license allowing them to march "when, where and as they did," so long as the march would not have "unduly disturbed" the "convenience of the public in the use of the streets," we affirmed the defendants' convictions, concluding that "[t]he measure of control fixed by the act is permissible in the public interest without invasion of the individual rights, and as a due exercise of legislative powers granted by the State Constitution." Id. at 146.

Next, we look to the Massachusetts Supreme Judicial Court's interpretation of Part I, Article 2 of the Massachusetts Constitution — a religious liberty provision that is substantially identical to Part I, Article 5 of the New Hampshire Constitution.[2] In Commonwealth v. Nissenbaum, the

---

[2] Part I, Article 2 of the Massachusetts Constitution provides: "It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the SUPREME BEING, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the

Massachusetts Supreme Judicial Court addressed the question of whether Part I, Article 2 "protects the possession of marihuana and hashish for religious purposes." Com. v. Nissenbaum, 536 N.E.2d 592, 593, 595-96 (Mass. 1989). In interpreting the "disturb the public peace" clause of Part I, Article 2, the court observed that, in 1780, "the General Court released a statement . . . pledg[ing] to protect professors of all denominations, demeaning themselves peaceably and as good subjects of the Commonwealth, in the free exercise of the rights of conscience," id. at 595-96 (quotation omitted), that "every indictment, whether for a common law or statutory offense, concludes by alleging that the offense was committed 'against the peace of the state,'" id. at 596, and that the United States Supreme Court had, in other contexts, found that "'all crimes are offenses against the peace,'" id. (quoting Williamson v. United States, 207 U.S. 425, 444 (1908)). Accordingly, the court found that "[i]n a broad sense, all offenses are breaches of the public peace." Id. The Supreme Judicial Court then proceeded to "[b]alanc[e] the competing interests," and, "giving significant weight and deference to the Legislature's determination that the possession, distribution, and cultivation of marihuana and hashish disturb the public order, although not controlled by that determination," the court concluded that "such conduct is not protected by art. 2 even if motivated by sincere religious purpose." Nissenbaum, 536 N.E.2d at 596. The court noted that it "agree[d] with the unanimous [federal] precedent that recognizes both an overriding governmental interest in regulating such substances and the practical impossibility of doing so and at the same time accommodating religious freedom." Id.

In a dissent, Justice Liacos made several important points. He maintained that the court relied too heavily on federal precedent, and failed to address the substantial linguistic differences between the First Amendment to the Federal Constitution — which provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," U.S. CONST. amend. I — and Part I, Article 2 of the Massachusetts Constitution. Nissenbaum, 536 N.E.2d at 600 (Liacos, J., dissenting). He explained that "the language of art. 2, unlike the First Amendment, strikes a clearly stated constitutional balance that provides that the exercise of religion in this Commonwealth is protected 'in the manner and season most agreeable to the dictates of a person's own conscience . . . provided he doth not disturb the public peace, or obstruct others in their religious worship.'" Id. (brackets omitted). Accordingly, Justice Liacos disagreed with the court's holding that "[i]n a broad sense, all offenses are breaches of the public peace," and stated that "[i]mplicit in [that] . . . approach is the thought that legislative enactments can amend the Constitution of the

---

dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship." MASS. CONST. pt. I, art. 2.

Commonwealth.  Surely, this stands constitutional analysis on its head."  Id. (quotation omitted).

Citing prior Massachusetts case law discussing the elements of the crime of disturbing the peace, Justice Liacos observed that "[t]he provision against 'disturbers of the peace' proscribes conduct which tends to annoy all good citizens and does in fact annoy anyone present not favoring it."  Id. at 601 (quotation omitted).  Accordingly, Justice Liacos stated that, "[t]o the extent that a person performs an act motivated by sincere religious beliefs and as part of a religious ritual or ceremony, the act will be protected by art. 2 so long as it harms no victim."  Id. at 601-02.  Justice Liacos concluded that, because "[t]he defendants were entitled to have the jury consider whether, in light of the evidence presented, the defendants were protected by the provisions of art. 2," he would vacate the defendants' convictions and grant them a new trial.  Id. at 602.

Five years later, in a concurring opinion in Attorney General v. Desilets, Justice Liacos expressed similar concerns.  See Attorney General v. Desilets, 636 N.E.2d 233, 245-46 (Mass. 1994) (Liacos, C.J., concurring).  In Desilets, the Massachusetts Supreme Judicial Court was faced with the question of whether the enforcement of a statute mandating that landlords not discriminate against unmarried couples when renting apartments would, under the Massachusetts and Federal Constitutions, violate the free exercise rights of the defendants — who declined to rent an apartment to an unmarried couple based on the defendants' religious belief that they should not facilitate what they regarded as "sinful cohabitation."  Id. at 234-35.

The court first addressed the protections afforded by Article 46, § 1 of the Amendments to the Massachusetts Constitution — a provision that is similar to the First Amendment to the Federal Constitution.[3]  Id. at 235.  Although much of the majority opinion focused on Article 46, § 1, the court reasoned that similar principles applied to the Part I, Article 2 analysis.  See id. at 242-43.  Accordingly, the case is instructive.  The court explained that in 1990, one year after it had decided Nissenbaum, the United States Supreme Court had, in Smith, "substantially altered its standard for determining whether conduct was protected under the free exercise of religion clause."  Id. at 235-36.  The Supreme Judicial Court noted that Smith was "a much criticized opinion that weakened First Amendment protections for religious conduct."  Id. at 236.  After observing that it "should reach its own conclusions on the scope of the protections of art. 46, § 1," the court held that it would "adhere to the standards of earlier First Amendment jurisprudence"; namely, "the balancing test that the [United States] Supreme Court had established under the free

---

[3] Article 46, § 1 of the Amendments to the Massachusetts Constitution provides: "No law shall be passed prohibiting the free exercise of religion."  MASS. CONST. amend. art. 46, § 1.

exercise of religion clause" in prior decisions.  Id.  The court noted that that standard "appears to be the same as that prescribed by the Religious Freedom Restoration Act of 1993," which was intended by Congress to counter the United States Supreme Court's decision in Smith and "restore the compelling interest test."  Id. at 236 n.5 (quotation omitted).

Accordingly, the court stated that its task would be "to determine whether the defendants have shown that the [statutory] prohibition . . . substantially burdens their free exercise of religion, and, if it does, whether the Commonwealth has shown that it has an interest sufficiently compelling to justify that burden," and that "the granting of an exemption to people in the position of the defendants would unduly hinder that goal."  Id. at 236, 238.  Further, the court explained, "[t]he general objective of [the statute] . . . cannot alone provide a compelling State interest that justifies the application of [the statute] in disregard of the defendants' right to free exercise of their religion."  Id. at 238.  "The analysis must be more focused."  Id.

The court, after acknowledging that the application of the balancing test could present practical challenges — such as proving or disproving the sincerity of a particular religious belief, or complicating the enforcement of certain laws — stated that it would "not readily subscribe to a rule that justified the denial of constitutional rights simply because the protection of those rights required special effort."  Id. at 240.  It then applied the balancing test, determining that, because the statute at issue affirmatively obligated the defendants to engage in conduct contrary to their sincerely held religious beliefs, it substantially burdened their right to the free exercise of religion.  Id. at 237-38.  The court also determined that, given the record, "the uncontested material facts disclose no basis for ruling that the Commonwealth can or cannot meet its burden of establishing that it has a compelling interest that can be fulfilled only by denying the defendants an exemption from [the statute]."  Id. at 241.  Accordingly, the court held that, under Article 46, § 1, the trial court should not have granted summary judgment in favor of the defendants, and that the Commonwealth should have the opportunity to prove its case at trial.  Id.

The court then addressed the protections for free exercise of religion arising under Part I, Article 2 of the Massachusetts Constitution.  Id.  The court stated that when an individual's religious practices do not "disturb the public peace or obstruct others in their religious worship," Part I, Article 2 "gives absolute protection to the manner in which one worships God.  No balancing of interests, the worshiper's, on the one hand, and the government's, on the other, is called for when neither exception applies."  Id. at 242 (quotation omitted).  In contrast, when an individual's religious practices do "disturb the public peace or obstruct others in their religious worship," then, under Part I, Article 2, "there would have to be a balancing of [the] competing

12

interests." Id. (quotation omitted). The court then determined that it had no occasion to engage in a separate balancing under Part I, Article 2 because, although the defendants' "conduct in violation of a State statute would disturb the peace," the balancing under Part I, Article 2 would be similar to that undertaken under Article 46, and no more favorable. Id. at 242-43. Accordingly, the court vacated the judgment in favor of the defendants, and remanded the case to the trial court to apply the balancing test in the first instance. See id. at 243.

We also look to interpretations of the Free Exercise Clause of the First Amendment to inform and guide our construction of Part I, Article 5. See Briand, 130 N.H. at 653 (examining federal and other state court decisions "to inform and guide our analysis" in interpreting another provision of the State Constitution). Of particular import are Smith and free exercise cases that preceded and followed it. As Judge Barbadoro of the United States District Court for the District of New Hampshire observed, prior to Smith, "any law that substantially burdened religiously motivated conduct was deemed to violate the First Amendment's Free Exercise Clause unless the law served a compelling state interest." Gary S. v. Manchester School Dist., 241 F. Supp. 2d 111, 120 (D.N.H. 2003). In Smith, the Supreme Court was faced with the question of whether the First Amendment "permits the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug, and thus permits the State to deny unemployment benefits to persons dismissed from their jobs because of such religiously inspired use." Smith, 494 U.S. at 874. Answering in the affirmative, the Court, in an opinion authored by Justice Scalia, dispensed with the "compelling state interest" requirement that it had first announced in Sherbert v. Verner, 374 U.S. 398, 403 (1963), reasoning that recent decisions "have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Smith, 494 U.S. at 879, 885-90 (quotation omitted). Central to the Court's reasoning was the proposition that laws "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." Id. at 879 (quotation omitted). Justice Scalia, quoting from an 1878 decision of the Court, queried: "Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." Id. (quotation omitted).

Accordingly, the Court held that "an individual's religious beliefs [do not] excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Id. at 878-79. The Court acknowledged that "leaving accommodation to the political process will place at a relative

disadvantage those religious practices that are not widely engaged in," but called this an "unavoidable consequence of democratic government" that "must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." Id. at 890.

The holding in Smith was controversial. In response to Smith, in 1993 Congress passed the Religious Freedom Restoration Act (RFRA) in order to "restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b) (2012). In 1997, the Supreme Court held that Congress had exceeded its constitutional authority under the Fourteenth Amendment to the United States Constitution when it imposed RFRA's compelling interest test on the states as well as the federal government. City of Boerne v. Flores, 521 U.S. 507, 532-36 (1997), superseded by statute on other grounds, Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274, 114 Stat. 803. City of Boerne is relevant to our analysis not for its holding, but rather because of the colloquy between Justice Scalia, who defended and expanded upon his analysis in Smith, and Justice O'Connor, who argued that Smith was wrongly decided. See City of Boerne, 521 U.S. at 537-44 (Scalia, J., concurring), 544-65 (O'Connor, J., dissenting). Especially instructive is their exchange regarding the free exercise provisions included in state constitutions that were adopted before — or contemporaneously with — the Federal Constitution and the Bill of Rights. See id. at 538-40 (Scalia, J., concurring), 552-57 (O'Connor, J., dissenting). Each focused on clauses in state constitutions similar to the "disturb the public peace" clause in the New Hampshire Constitution. See id. Indeed, both Justices specifically referenced Part I, Article 5 of the New Hampshire Constitution. See id. at 538-39 (Scalia, J., concurring), 553 (O'Connor, J., dissenting).

Justice Scalia wrote: "At the time these provisos were enacted, keeping 'peace' and 'order' seems to have meant, precisely, obeying the laws. '[E]very breach of a law is against the peace.' Queen v. Lane, 6 Mod. 128, 87 Eng. Rep. 884, 885 (Q.B. 1704)." Id. at 539 (Scalia, J., concurring). He explained that "[e]ven as late as 1828, when Noah Webster published his American Dictionary of the English Language, he gave as one of the meanings of 'peace': '8. Public tranquility; that quiet, order and security which is guaranteed by the laws; as, to keep the peace; to break the peace.' 2 An American Dictionary of the English Language 31 (1828)." Id. at 539-40. According to Justice Scalia, "[t]his limitation upon the scope of religious exercise would have been in accord with the background political philosophy of the age (associated most prominently with John Locke), which regarded freedom as the right 'to do only what was not lawfully prohibited,' West, The Case Against a Right to Religion-Based Exemptions, 4 Notre Dame J. L., Ethics & Pub. Pol'y 591, 624 (1990)." Id. at 540. He reasoned that, "'[t]hus, the disturb-the-peace caveats apparently

permitted government to deny religious freedom, not merely in the event of violence or force, but, more generally, upon the occurrence of illegal actions.' Hamburger, [A Constitutional Right of Religious Exemption: An Historical Perspective, 60 Geo. Wash. Law Rev. 915, 918-19 (1992)]." Id.

Justice O'Connor offered a different perspective: "The language used in these state constitutional provisions . . . strongly suggests that, around the time of the drafting of the Bill of Rights, it was generally accepted that the right to 'free exercise' required, where possible, accommodation of religious practice." Id. at 554 (O'Connor, J., dissenting). "If not," and "if the Court was correct in Smith that generally applicable laws are enforceable regardless of religious conscience," she explained, "there would have been no need for these documents to specify, as the New York Constitution did, that rights of conscience should not be construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the State." Id. (quotation and brackets omitted). She reasoned that "[s]uch a proviso would have been superfluous. Instead, these documents make sense only if the right to free exercise was viewed as generally superior to ordinary legislation, to be overridden only when necessary to secure important government purposes." Id. at 554-55. Justice O'Connor noted that "[the] practice of excusing religious pacifists from military service demonstrates that, long before the First Amendment was ratified, legislative accommodations were a common response to conflicts between religious practice and civil obligation." Id. at 559. "Notably," she said, "the Continental Congress exempted objectors from conscription to avoid 'violence to their consciences,' explicitly recognizing that civil laws must sometimes give way to freedom of conscience." Id. (quoting Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1468-69 (1990)).[4]

Also instructive is the 2006 opinion of the Supreme Court in Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, as the case is factually similar to the case before us, and is an example of the Court's application of the "compelling interest" balancing test mandated by RFRA. See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006). In Gonzales, the Supreme Court considered whether a sect of Christian Spiritists was entitled to a preliminary injunction prohibiting the federal government from interfering with its members' religious practice of "receiv[ing] communion by drinking a sacramental tea, brewed from plants . . . that contain[] a hallucinogen regulated under the Controlled Substances Act." Id. at 423, 425.

---

[4] The article cited by Justice O'Connor, authored by Professor Michael McConnell before Smith was decided by the Supreme Court, provides an informative and thorough analysis of the historical and philosophical underpinnings of the legal protections afforded to the free exercise of religion in the United States. Following the Court's decision in Smith, Professor McConnell published another article in which he criticized the reasoning of the majority. See Michael W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U. Chi. L. Rev. 1109 (1990).

Although the government conceded that drinking the sacramental tea containing dimethyltryptamine — the regulated hallucinogen found naturally in one of the plants used to brew the tea — "is a sincere exercise of religion," it nonetheless "sought to prohibit . . . the sect from engaging in the practice, on the ground that the Controlled Substances Act bars all use of the hallucinogen." Id. The trial court had entered a preliminary order enjoining enforcement of the Controlled Substances Act against the sect, a decision that was affirmed by the United States Court of Appeals for the Tenth Circuit. See id. at 423, 439. On appeal, the Supreme Court applied the compelling interest balancing test mandated by RFRA, and left the preliminary injunction in place. See id.

The Court explained that RFRA "adopt[ed] a statutory rule comparable to the constitutional rule rejected in Smith" that "prohibits the Federal Government from substantially burdening a person's exercise of religion, unless the Government demonstrates that application of the burden to the person represents the least restrictive means of advancing a compelling interest." Id. at 423-24 (quotation omitted). In Gonzales, the government conceded the sect's prima facie case: that the application of the Controlled Substances Act would substantially burden a sincere religious practice. Id. at 428. Accordingly, the burden was on the government to prove that the application of the Controlled Substances Act to the sect was the least restrictive means of furthering a compelling government interest. Id. at 428-29.

The government argued that, because the hallucinogen at issue was a Schedule I substance with a high potential for abuse, and because it lacked any currently accepted, or safe, medical uses, the government's interest in not providing an individualized exception to the Controlled Substances Act for the sect was compelling. Id. at 430. Further, the government contended that the Controlled Substances Act established "a closed system that prohibits all use of controlled substances except as authorized by the Act itself," and that "there would be no way to cabin religious exceptions once recognized." Id. (quotation omitted).

The Court was not persuaded, and noted that "RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach." Id. "RFRA," the Court explained, "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 430-31 (quoting 42 U.S.C. § 2000bb-1(b)). In concluding that the government had failed to carry its burden, the Court found that the government's "mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the

16

day." Id. at 423, 432. Indeed, the Court noted that the "well-established peyote exception" allowing Native American sacramental use of peyote, another Schedule I substance, "fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." Id. at 433-34. Finally, the Court observed that "Congress recognized that 'laws neutral toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise,' and legislated 'the compelling interest test' as the means for the courts to 'strike sensible balances between religious liberty and competing prior governmental interests.'" Id. at 439 (quoting 42 U.S.C. §§ 2000bb(a)(2), (5)) (brackets omitted).

With these cases and important principles in mind, we now construe Part I, Article 5. In doing so, we are mindful that Part I, Article 5 obliges the accommodation of religious practices that do not "disturb the public peace." N.H. CONST. pt. I, art. 5; Hale, 53 N.H. at 61. Although we agree with the Massachusetts Supreme Judicial Court that, "[i]n a broad sense, all offenses are breaches of the public peace," Nissenbaum, 536 N.E.2d at 596, that cannot be the end of our constitutional inquiry. Indeed, as Justice O'Connor observed in her persuasive historical analysis set forth in City of Boerne, state constitutional provisions such as Part I, Article 5 "make sense only if the right to free exercise was viewed as generally superior to ordinary legislation, to be overridden only when necessary to secure important government purposes." City of Boerne, 521 U.S. at 553-55 (O'Connor, J., dissenting). The rights set forth in Part I, Article 5 are "natural and unalienable." N.H. CONST. pt. I, art. 5. The framers of our State Constitution expressly provided that these "rights of conscience could not be . . . surrendered; nor could society or government have any claim or right to assume to take them away, or to interfere or intermeddle with them, except so far as to protect society against any acts or demonstrations of one sect or persuasion which might tend to disturb the public peace, or affect the rights of others." Hale, 53 N.H. at 61.

Additionally, as Justice O'Connor observed in Smith, the federal Free Exercise Clause "was enacted precisely to protect the rights of those whose religious practices are not shared by the majority and may be viewed with hostility," and that "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials" such that the fundamental rights of "freedom of worship . . . may not be submitted to vote; they depend on the outcome of no elections." Smith, 494 U.S. at 902-03 (O'Connor, J., concurring) (quotations omitted). So too was our State Constitution "intended to be [a] restraining document[]," one designed to ensure "that [the] exercise of power by the majority does not go unchecked." State v. LaFrance, 124 N.H. 171, 177 (1983). "We do not have unqualified majority rule; we have majority rule with

17

protection for minority and individual rights. Without this limitation we would have a tyranny of the majority and we would lose our liberty." Id.

It is well-established that "[w]hile the role of the Federal Constitution is to provide the minimum level of national protection of fundamental rights, our court . . . has the power to interpret the New Hampshire Constitution as more protective of individual rights than the parallel provisions of the United States Constitution," and "[t]he [United States] Supreme Court has recognized this authority." Ball, 124 N.H. at 231-32 (citing Cooper v. California, 386 U.S. 58, 62 (1967)); see also PruneYard Shopping Center v. Robins, 447 U.S. 74, 81 (1980) (recognizing "the authority of the State . . . to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution"). Additionally, given the substantial linguistic differences between the First Amendment and Part I, Article 5, we should not rely heavily on federal precedent when interpreting Part I, Article 5. See Nissenbaum, 536 N.E.2d at 600 (Liacos, J., dissenting) (espousing the same principle with respect to Part I, Article 2 of the Massachusetts Constitution).

Accordingly, in construing our State Constitution, we decline to adopt the reasoning of Smith. In Smith, the Supreme Court found that, under the First Amendment, although generally applicable laws "cannot interfere with mere religious belief and opinions, they may with practices." Smith, 494 U.S. at 879 (quotation omitted). Therefore, absent an attempt to target particular religious practices, the Court stated that "an individual's religious beliefs [do not] excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Id. at 877-79. Our State Constitution is different: it expressly protects religious belief and religious practices, and we do not construe it to distinguish between the impact of laws of general application and laws that target particular religious practices. See N.H. CONST. pt. I, art. 5; Hale, 53 N.H. at 61. We agree with Justice O'Connor, who, after observing that the majority in Smith "permit[ted] the government to prohibit, without justification, conduct mandated by an individual's religious beliefs, so long as that prohibition is generally applicable," stated that

> a law that prohibits certain conduct — conduct that happens to be an act of worship for someone — manifestly does prohibit that person's free exercise of his religion . . . regardless of whether the law prohibits the conduct only when engaged in for religious reasons, only by members of that religion, or by all persons.

Smith, 494 U.S. at 893-94 (O'Connor, J., concurring). We also agree with Justice O'Connor's observation that criminalizing "religiously motivated conduct burdens that individual's free exercise of religion in the severest manner possible, for it results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." Id. at 898

18

(O'Connor, J., concurring) (quotation omitted). Therefore, if Part I, Article 5 is to provide meaningful protection to the free exercise of religion, "it ought not be construed to cover only the extreme and hypothetical situation in which [the legislature] directly targets a religious practice." Id. at 894 (O'Connor, J., concurring) (observing also that to do so would relegate a serious constitutional value to the "barest level of minimum scrutiny that the Equal Protection Clause already provides" (quotation omitted)); see also City of Boerne, 521 U.S. at 546 (O'Connor, J., dissenting) (observing that "the Free Exercise Clause is not simply an antidiscrimination principle that protects only against those laws that single out religious practice for unfavorable treatment," but "[r]ather, the Clause is best understood as an affirmative guarantee of the right to participate in religious practices and conduct without impermissible governmental interference").

We therefore conclude that when religious practices violate a generally applicable law, our State Constitution, like Part I, Article 2 of the Massachusetts Constitution, demands that "there . . . be a balancing of [the] competing interests." Desilets, 636 N.E.2d at 242-43; see also Nissenbaum, 536 N.E.2d at 596. The Massachusetts Supreme Judicial Court has articulated the balancing test as requiring the State to demonstrate that it has "an important governmental interest that is sufficiently compelling that the granting of an exemption to [an individual] in the position of the defendant[] would unduly hinder that goal," Desilets, 636 N.E.2d at 238; we choose to adhere to our traditional formulation of strict judicial scrutiny — requiring the State to demonstrate that its action is "necessary to achieve a compelling governmental interest and narrowly tailored to meet that end." Cmty. Res. for Justice v. City of Manchester, 154 N.H. 748, 759 (2007) (quotation omitted); see also Desilets, 636 N.E.2d at 236 & n.5 (recognizing that the Massachusetts articulation of the balancing test is essentially the same as the compelling interest balancing test, otherwise known as strict scrutiny). Accordingly, under Part I, Article 5, once an individual establishes that the government action substantially burdens his or her sincere religious practice, Desilets, 636 N.E.2d at 236-37, the burden shifts to the State to show both that the government action is necessary to achieve a compelling government interest, and is narrowly tailored to meet that end. See id. at 238; Cmty. Res. for Justice, 154 N.H. at 759.

This analysis must be focused: it must pertain to the individual or those in similar circumstances; "[t]he general objective of [the statute] . . . cannot alone provide a compelling State interest that justifies the application of [the statute] in disregard of the defendant[']s right to free exercise of [the defendant's] religion." Desilets, 636 N.E.2d at 238; see also N.H. CONST. pt. I, art. 5 ("Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience, and reason . . . provided he doth not disturb the public peace or disturb others in their religious worship."

19

(emphases added)); Gonzales, 546 U.S. at 423, 430-32 (explaining that, under RFRA, the "mere invocation" of a generalized interest in enforcement "cannot carry the day," and that the compelling interest test must be satisfied "through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened" (quoting 42 U.S.C. § 2000bb-1(b)). In sum, we conclude that the compelling interest balancing test is the best "means for the courts to 'strike sensible balances between religious liberty and competing prior governmental interests.'" Gonzales, 546 U.S. at 439 (quoting 42 U.S.C. §§ 2000bb(a)(2), (5)) (brackets omitted).

The State contends that White and Cox mandate that we set a lower constitutional bar for evaluating government actions that burden the free exercise of religion than we set today. We disagree. In both White and Cox, the statutes at issue prohibited certain disruptive conduct only in certain designated places, and only if those participating in the conduct did not first obtain a license, permit, or other lawful permission. See White, 64 N.H. at 49; Cox, 91 N.H. at 138, 146. Accordingly, given the limited scope of the statutes at issue, and the fact that both statutes expressly provided that anyone could apply for and obtain a license, permit, or other lawful permission to engage in the conduct at issue, it is far from clear that either statute substantially burdened religious practices. Therefore, neither case would have triggered the application of the compelling interest balancing test pursuant to the "disturb the public peace" clause of Part I, Article 5. Further, White and Cox both pre-date the development of the modern tiers of judicial scrutiny, including strict scrutiny and its compelling interest standard. See Stephen A. Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny, 48 Am. J. Legal Hist. 355, 357-58 (2006); Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. __, __ (decided Nov. 25, 2020) (Gorsuch, J., concurring) (slip op. at 3) (observing, in a free exercise case in which the Court applied strict judicial scrutiny, that the analysis in a 1905 decision of the Court "pre-dated the modern tiers of scrutiny"). It is, therefore, not at all surprising that neither White nor Cox employs the tiered scrutiny terminology or analysis that courts use today. See generally Cmty. Res. for Justice, 154 N.H. at 758-62 (describing the development of tiered judicial scrutiny). Accordingly, neither case is in tension with our holding today, nor with our longstanding rule that we apply strict judicial scrutiny to government actions that impinge upon fundamental constitutional rights. See, e.g., In re Sandra H., 150 N.H. 634, 637-38 (2004) (observing, in an involuntary civil commitment case, that we apply "the most exacting scrutiny" when fundamental rights are impinged (quotation omitted)). And, here, there is no doubt that a fundamental constitutional right has been infringed. See N.H. CONST. pt. I, art. 5; Hale, 53 N.H. at 61.

In reaching this conclusion, we are not alone. Other state supreme courts have also concluded that their state constitutions provide greater protection for the free exercise of religion than does the Free Exercise Clause of

20

the Federal Constitution.  As explained earlier, the Massachusetts Supreme Judicial Court construed the Massachusetts Constitution to provide greater protection for the free exercise of religion than does the First Amendment.  See Desilets, 636 N.E.2d at 235-36, 242-43.  The Maine Supreme Judicial Court reached a similar conclusion with respect to its state constitution.  See Rupert v. City of Portland, 605 A.2d 63, 65-66 (Me. 1992) (applying the compelling interest balancing test to free exercise of religion cases brought under the state constitution).  Indeed, state supreme courts in several other states have construed their state constitutions to be more protective of religious liberty than the Federal Constitution.  See, e.g., Swanner v. Anchorage Equal Rights Com'n, 874 P.2d 274, 280-81 (Alaska 1994); State v. Hershberger, 462 N.W.2d 393, 397 (Minn. 1990); Humphrey v. Lane, 728 N.E.2d 1039, 1044-45 (Ohio 2000); see also Gary S. Gildin, The Sanctity of Religious Liberty of Minority Faiths Under State Constitutions: Three Hypotheses, 6 U. Md. L.J. Race, Religion, Gender & Class 21, 31-32 & n.57 (2006) (observing that courts in several states "have interpreted their state constitutions to mandate application of the compelling interest/no less restrictive alternative test to laws that have the effect of limiting a sincere religious practice, even absent an untoward legislative purpose").

Finally, although we recognize that the application of the compelling interest balancing test may present practical challenges, we cannot "justif[y] the denial of constitutional rights simply because the protection of those rights require[s] special effort."  Desilets, 636 N.E.2d at 240.  The compelling state interest balancing test has proven to be a workable standard in free exercise cases.  Not only does the United States Supreme Court apply the test under RFRA, see 42 U.S.C. § 2000bb; Gonzales, 546 U.S. at 423-24, it also does so in its First Amendment analysis in the event that it determines that the challenged laws "are not 'neutral' and of 'general applicability.'"  Roman Catholic Diocese of Brooklyn, 592 U.S. at __ (per curiam) (slip op. at 1-7) (emphasis added) (concluding that restrictions were not facially neutral, and ordering preliminary injunctive relief in case brought by religious institutions challenging restrictions placed on the size of religious gatherings due to the COVID-19 pandemic).  Moreover, several states have enacted RFRA-like statutes mandating the application of the compelling interest balancing test.  See, e.g., Conn. Gen. Stat. § 52-571b (2017); R.I. Gen. Laws § 42-80.1-3 (2006); see also Gildin, supra, at 31 & n.55.  At least one state, Alabama, has amended its state constitution to so provide.  See ALA. CONST. amend. 622; Gildin, supra, at 31 & n.56.

In conclusion, the trial court did not apply the compelling interest balancing test that Part I, Article 5 requires.  Nor, understandably, did it make the factual findings necessary to determine whether, under the test, the defendant's possession and sacramental use of psilocyn and/or psilocybin mushrooms are protected under Part I, Article 5.  We therefore vacate the trial

21

court's order denying the defendant's motion to dismiss, and remand for further proceedings consistent with this opinion.

<u>Order on motion to dismiss is vacated and remanded</u>.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.